Richard Leander **FEREBEE, Jr.,** et al., **Plaintiffs,**

v.

**CHEVRON CHEMICAL COMPANY,** Defendant.

**Civ. A. No. 81–1129.**

United States District Court, District of Columbia.

Dec. 20, 1982.

Robert Cash Liotta and Nathan I. Finkelstein, Washington, D.C., for plaintiffs.

Laidler B. Mackall, Loren Kieve and Sally J. Schornstheimer of Steptoe & Johnson, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

This products liability case is before the Court on defendant's motion for judgment notwithstanding the verdict. On November 4, 1982, a jury of six rendered a verdict for plaintiffs in the amount of $60,000.[1] Because the Court is convinced that there was sufficient evidence as a matter of law to support the jury's verdict, defendant's motion is denied.

### I. *Facts of the Case*

Richard Leander Ferebee, the original plaintiff in this case, began work as an agricultural worker at the Beltsville Agricultural Research Center (BARC), an installation of the United States Department of Agriculture, in Beltsville, Maryland, in 1967. Mr. Ferebee's job frequently required him to spray various chemicals on the plants, including insecticides and herbicides, both inside the greenhouses and, in the summer, outside in the fields. Mr. Ferebee began spraying paraquat, a herbicide, in the summer of 1977. He used the product periodically during the outdoor growing seasons of 1977, 1978, and 1979.

Mr. Ferebee learned how to mix and spray paraquat primarily through the oral instructions and demonstrations of his supervisors and co-workers, rather than from the written instructions on the label. Whether Mr. Ferebee ever read the label at all later became the subject of considerable controversy between the parties.[2]

When Mr. Ferebee sprayed paraquat in the fields, he frequently got the dilute

---

1. The Court subsequently entered an additional judgment for plaintiffs in the amount of $77,500, pursuant to a stipulation between the parties.

2. *See* pp. 1302–1304, *infra.*

spray on his skin,[3] most frequently when he used his hands to shield plants while he sprayed weeds growing around them. In his testimony, he described two incidents of significantly greater exposure. The first incident occurred soon after he began using paraquat. On that day, he spent several hours walking behind a tractor that was spraying paraquat. His head and bare arms became drenched with spray.[4] At the end of the day, he began to feel dizzy and exhausted. When he went home, he did not even wash or change his clothes, but fell asleep instantly. However, the dizziness and other symptoms did not persist, and he later returned to work.

Mr. Ferebee's other major single exposure to paraquat occurred later the same season. On that day, he was spraying weeds in the field, using a hand-held sprayer.[5] He had been spraying for some time when he noticed that the sprayer was defective and had leaked paraquat solution all over his pants. He stopped spraying and cleaned up as much as possible; however, he was not able to change his clothes until he went home.

Mr. Ferebee testified that he always washed his hands after using paraquat and was very careful not to touch his face when he had paraquat on his hands, because his co-workers had warned him that paraquat was dangerous if swallowed.[6] However, BARC did not have shower facilities for its employees, and Mr. Ferebee rarely, if ever, changed his clothes during the work day.[7]

Up until late 1977, Mr. Ferebee was in reasonably good health, although he did suffer from some health problems. For example, he had a life-long sinus problem. He was overweight during the mid-1970's, and he suffered from high blood pressure. However, according to the doctors who later treated him, none of these problems were life-threatening or seriously disabling, although he did suffer from some shortness of breath. He had no known lung problems before he began spraying paraquat.

In late 1977, Mr. Ferebee began noticing a marked change in his physical condition, notably a substantial increase in shortness of breath. During the next four and a half years, his condition deteriorated steadily. He was hospitalized several times, and consulted a number of doctors, including Dr. Muhammad Yusuf, a practicing pulmonary specialist, and Dr. Ronald G. Crystal, Chief of the Pulmonary Branch of the Heart, Lung and Blood Institute of the National Institutes of Health. His condition was

---

**3.** There was no evidence that Mr. Ferebee ever spilled concentrated paraquat on his skin or clothing. His only contact was with a solution of dilute paraquat, presumably mixed in the proportions recommended on the label. The parties also stipulated, as Mr. Ferebee testified (and there was no evidence to the contrary), that Mr. Ferebee's only significant exposure to paraquat was on his intact skin; i.e., there was no evidence that Mr. Ferebee swallowed or inhaled paraquat, or that he spilled or sprayed it on an area of his skin upon which he had any apparent cuts or scrapes. The jury was not, of course, precluded from concluding that a person engaged in Mr. Ferebee's line of work could have had some, or even many, minor cuts or abrasions not readily discernable to the naked eye or likely to be remembered some time later.

**4.** Defendant argued that Mr. Ferebee's testimony did not describe any drenching of Mr. Ferebee's shirt or other clothes on that day. Since Mr. Ferebee was no longer alive at the time of trial, he was not available to clarify this point. It would, however, have been perfectly reason-

able for the jury to infer from his description of the incident that his clothes became wet from the spray.

**5.** This was how Mr. Ferebee usually applied paraquat.

**6.** There is no question that the label on the paraquat container gave considerable warning of this danger.

**7.** Under instructions from his supervisor, Mr. Ferebee wore a protective coverall and/or respirator in the winter when spraying in the greenhouse. However, when spraying outside, he was not required or advised to use these items. Plaintiffs and their witnesses gave several reasons for this, including the greater wind and lower angle of spray outside, which reduced the exposure to the chemical, the heat, which made the wearing of a heavy waterproof suit extremely difficult in the hot and humid summer weather, and Mr. Ferebee's sinus problems, which made it very difficult for him to breath through a respirator.

diagnosed as pulmonary fibrosis. After taking Mr. Ferebee's history [8] and performing a number of tests,[9] the treating physicians identified paraquat poisoning as the cause of the pulmonary fibrosis. All other known causes of pulmonary fibrosis were ruled out,[10] and, as Drs. Yusuf and Crystal testified at trial, the diagnosis of paraquat poisoning was made, to a reasonable degree of medical certainty, long before Mr. Ferebee's death.

Mr. Ferebee instituted this suit in 1981, against Chevron Chemical Corporation, the sole distributor of paraquat in the United States.[11] On the eve of trial, on March 18, 1982, Mr. Ferebee died. A survival action was continued by his estate, and a wrongful death count was added on behalf of Mr. Ferebee's minor children. The amended complaint alleged negligence, breach of warranty, and strict liability, all stemming from defendant's alleged failure to provide an adequate warning that dermal exposure to paraquat could cause serious lung disease and death. Punitive damages were also sought. At the end of the 2½ week trial, the Court directed a verdict for defendant on the punitive damages claim. The negligence and breach of warranty claims were also dropped, and only the product liability claim was submitted to the jury.

After 3 days of deliberation, the jury was hopelessly divided, and the Court declared a mistrial. The case was tried for the second time in October, 1982.[12]

At the second trial, plaintiffs presented excerpts from a videotape deposition of Mr. Ferebee taken before his death. Mr. Ferebee described his medical history and the circumstances surrounding his employment and exposure to paraquat. Plaintiffs' live witnesses included Drs. Yusuf and Crystal, who described their treatment of Mr. Ferebee and the considerations underlying their diagnosis of paraquat poisoning, including Mr. Ferebee's medical history, laboratory tests, consultations with other doctors, and the medical literature on other cases of paraquat-induced illness. Members of Mr. Ferebee's family also testified about their observations of his illness and the children's loss of solatium. One of Mr. Ferebee's co-workers testified about paraquat use at BARC by Mr. Ferebee and others.[13]

Defendant's live testimony focused primarily on the issue of whether paraquat caused Mr. Ferebee's illness and death. Dr. H. Kenneth Fisher, a pulmonary specialist who acts as a part-time consultant to defendant on paraquat, and Dr. Charles Carrington, a pathologist who was once involved in the treatment of a confirmed case of paraquat poisoning, gave their opinion that Mr. Ferebee's illness was not caused by paraquat.[14] Dr. Henry Wagner, a distinguished independent radiologist, testified that the gallium scans taken of Mr. Fere-

---

**8.** Paraquat is excreted from the body very soon after it is taken in. The doctors therefore had to rely on the history of paraquat exposure rather than any detection of paraquat in Mr. Ferebee's body.

**9.** These included pulmonary function tests, a liver biopsy, gallium scans, and x-rays.

**10.** As defendant pointed out over and over again at trial, a substantial number of cases of pulmonary fibrosis are "idiopathic," i.e., their cause is unknown. At trial, defendant and its experts characterized idiopathic pulmonary fibrosis (IPF) as a distinct disease, with an identifiable pattern of symptoms. Plaintiffs and their experts, on the other hand, characterized IPF as a group of pulmonary fibrosis types with different, as-yet-unknown, causes. They claimed to have identified paraquat poisoning as the cause of one type of pulmonary fibrosis that would have been characterized as IPF if the history of paraquat exposure had not been known.

**11.** Mr. Ferebee's employer, BARC, was not a party.

**12.** The second trial was considerably shorter than the first one. All evidentiary rulings from the first trial, with the exception of some items of testimonial evidence, were carried over to the second trial, with all objections preserved.

**13.** Plaintiffs' counsel read into the record the earlier testimony of Dr. Jon E. Ford, a toxicologist employed by Chevron, along with a number of stipulations on miscellaneous factual issues.

**14.** Defendant's experts identified Mr. Ferebee's illness as IPF.

bee's co-workers were negative.[15] Defendant concluded by presenting evidence that the label on the container of paraquat Mr. Ferebee used complied with EPA labelling regulations in force at that time. Defendant also called a BARC employee, who testified that when he sprayed paraquat (usually from a tractor), he wore protective clothing.

At the close of the evidence, the Court reaffirmed its directed verdict on the punitive damages issue and submitted the rest of the case to the jury on the issue of strict product liability. The Court instructed the jury that plaintiffs had the burden of proving all of the following elements by a preponderance of the evidence:

1. That paraquat proximately caused Mr. Ferebee's illness and death;

2. That paraquat is inherently dangerous;

3. That defendant knew, or should have known, at the time it sold the paraquat used by Mr. Ferebee, that paraquat is inherently dangerous;

4. That the resulting duty to provide an adequate warning of the danger was not met; and

5. That the inadequacy of the warning proximately caused Mr. Ferebee's illness and death.

The jury was further instructed that if plaintiffs proved these elements, defendant had the burden of proving its defense of misuse.[16]

The pecuniary damages suffered by plaintiffs were the subject of a stipulation between the parties. The jury was instructed to consider only nonpecuniary losses if it came to the point of assessing damages. After four hours of deliberation, the jury returned a verdict for plaintiffs and awarded $60,000 in the wrongful death action.[17] Judgment was entered on this verdict, and a separate judgment was entered for plaintiffs on the stipulation in the amount of $77,500. It is these judgments that defendant now attacks.[18]

## II. *Motion for Judgment N.O.V.*

Defendant's motion for judgment n.o.v. raises a number of issues upon which defendant claims the evidence either requires an outright finding in its favor or is at least insufficient to support a finding for plaintiffs. These issues will be discussed in the order in which they are presented in defendant's motion.

### A. *Susceptibility*

Defendant's first argument is that it cannot, as a matter of law, be held liable for injuries sustained by a particularly susceptible individual. *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377, 380 (D.Md.1975), *aff'd.,* 567 F.2d 269 (4th Cir.1977), a breach of warranty case, is cited in support of this proposition. Defendant argues that Mr. Ferebee's injury was the first of its kind to be attributed to paraquat, and that Chevron can only be held liable if it knew that paraquat was dangerous "to a substantial number of the population." Jury Instruction, Tr. at 2097; Restatement (Second) of Torts § 402A comment j. Since Mr. Ferebee's injury was unique, defendant argues, it by definition was not a danger to a substantial number of the population.

This argument depends upon a major fallacy, which runs throughout many of the arguments defendant has made to the Court—and to the jury—in this and other contexts. This fallacy consists of the confusion of two logically distinct issues in the case: (1) whether paraquat caused Mr. Fer-

---

15. Dr. Crystal disagreed.

16. A summary of these instructions, describing the issues to be decided and the order in which the jury should consider them, was provided to the jury for reference in the jury room.

17. The jury awarded no damages in the survival action. The stipulation, however, recognized $60,000 in pecuniary damages in the survival action, and the Court awarded the estate this amount on the basis of the jury's general finding of liability.

18. The judgment on the stipulation was dependent upon the jury's verdict imposing liability on defendant. Therefore, were judgment n.o.v. appropriate here, both judgments for plaintiffs would have to be vacated.

ebee's illness, and (2) whether Chevron had notice at the time it packaged the product used by Mr. Ferebee that illness of this kind could result if an adequate warning was not given. Evidence on the alleged "uniqueness" of Mr. Ferebee's illness was important to both these issues, but in very different ways.

In arguing that Mr. Ferebee's illness was not caused by paraquat, defendant pointed to a number of dissimilarities between Mr. Ferebee's case and most confirmed cases [19] of paraquat poisoning. First, the circumstances of the exposure differed from most cases in that it consisted totally or almost totally of exposure of intact skin [20] to a dilute solution of paraquat. There were also varied differences in the symptoms and course [21] of the illness. Defendant claimed that this was the only case of long-term pulmonary fibrosis resulting from exposure of intact skin to diluted paraquat. Plaintiffs disagreed, pointing to evidence of a few other cases that they claimed were markedly similar in nearly all respects and many others that were similar in some respects. Whether Mr. Ferebee's case was in fact unique rather than one of a few with this specific exposure, symptoms, and course was clearly a question for the jury to decide. It is clear, however, that cases exactly like Mr. Ferebee's are rare. The question is: how does that fact affect plaintiffs' case?

The relevance of this evidence to the causation issue is obvious. If Mr. Ferebee's illness differs from most cases of paraquat poisoning, it can be argued that it most likely was not caused by paraquat. If most people who get sick from exposure to paraquat have different kinds of exposure, demonstrate different symptoms, have different

test results, and/or die or recover in a different span of time, then the likelihood of Mr. Ferebee's illness being paraquat poisoning would seem to decrease. However, this "uniqueness" argument is far from determinative on the causation issue. Plaintiffs presented evidence of other cases that were very similar to Mr. Ferebee's. Moreover, the experts who diagnosed Mr. Ferebee's illness testified that: (1) similarity to other cases was only one of several factors underlying the diagnosis, and (2) 100 percent identity of symptoms and other factors with any particular number of cases was not as important as the fact that each of Mr. Ferebee's test results and symptoms correlated with those of an identifiable group of paraquat victims. Thus, plaintiffs' evidence, taken as a whole, built a plausible claim that each stage and symptom of Mr. Ferebee's illness could be traced to paraquat. Even if the jury agreed with defendant's contention that the course of Mr. Ferebee's disease was rare, therefore, there was plenty of evidence on plaintiffs' side to support a verdict that the disease was caused by dermal exposure to paraquat.

The rarity of Mr. Ferebee's case is also relevant to the issue of notice. The important question here is whether this impact from use of the product was foreseeable. If Mr. Ferebee's illness was an unforeseeable fluke resulting from his own peculiar susceptibility, then defendant could not be charged with a duty to foresee this injury and warn against it.[22] On the other hand, "[i]f the injury is reasonably foreseeable, . . . even if rare, the seller cannot rely on its history of good fortune to exempt itself from liability." *Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 246 (2d Cir.1980).

---

**19.** That is, confirmed by defendant.

**20.** *See* note 3, *supra.*

**21.** Nearly all cases of paraquat poisoning described by both parties ended in either death or complete recovery in a relatively brief period, usually less than a year. Mr. Ferebee survived for approximately 4½ years.

**22.** The Restatement (which is the source of the "substantial number of the population" language in the jury instruction) discusses this

concept in terms of allergies. Even the most innocuous of everyday substances may produce allergic reactions in a tiny number of people. Only those presenting a danger to a substantial number must give a warning of the danger of such a reaction. Similarly, if Mr. Ferebee's illness was the result of a reaction to paraquat unlikely to be repeated in others, Chevron had no duty to warn of it.

On this issue, evidence of comparison between Mr. Ferebee's case and others has a different complexion. Many items that are important on the causation issue, particularly those dealing with the symptoms and course of the illness, have no relevance whatsoever on the issue of notice. For example, if most paraquat victims develop skin lesions before dying, while Mr. Ferebee did not, the causation of Mr. Ferebee's illness can be called into question, but defendant's notice that dermal exposure to paraquat causes death cannot. There was no alleged need for the label to give full details of the symptoms and course of the illness that would precede death. If Mr. Ferebee's illness was caused by paraquat, and the jury necessarily concluded that it was, then the only question on the notice issue is whether defendant knew that illness *of this general type* (i.e., fibrotic lung disease leading to death) could be caused by dermal exposure[23] to dilute paraquat,[24] or should have known about it, considering the numerous reports of fatal lung disease—of some kind—resulting from dermal exposure—of some kind—to paraquat.

### B. *Chevron's Knowledge in 1979 and Before*

Defendant argues that, since its duty to warn of the dangers of using paraquat was dependent upon its reasonable knowledge of those dangers, at the relevant time, *Chambers v. G.D. Searle & Co.*, 441 F.Supp. at 381, it had no duty to warn of the danger of contracting chronic (i.e., long-term) pulmonary fibrosis from dermal exposure to paraquat. Defendant points out that the three cases allegedly similar to Mr. Ferebee's were all reported after the period at issue.[25] Therefore, defendant argues, it had no duty, at the time, to warn of this particular danger.

The flaw in this argument is again the narrow classification of the danger at issue. There was plenty of evidence that defendant had notice, through both its own incident reports and cases reported in the medical literature,[26] that dermal exposure to paraquat could cause lung disease and death, albeit not necessarily after an illness as prolonged as Mr. Ferebee's. Having failed to warn that dermal exposure to paraquat can cause death almost immediately, defendant is hardly in a position to argue that it did not know, and therefore had no duty to warn, that the product could cause a similar death preceded by a long and painful illness. Similarly, since there was no warning on the paraquat label about the danger of exposure to broken skin—which might conceivably have provided a

---

**23.** Defendant stressed that Mr. Ferebee's exposure was to intact skin. They argued that every other case involved skin lesions either before (i.e., helping to cause) the injury or after (i.e., caused by) the injury. The former is relevant to the notice issue, but the latter is not. As long as there were a significant number of other cases in which the skin was intact *at the time of exposure,* then the jury could properly conclude that there was enough notice to give rise to a duty to warn, even if those other cases, unlike Mr. Ferebee's, involved skin lesions *after* the exposure.

**24.** Of course, since the label did not warn that dermal exposure to *undiluted* paraquat could cause death (which defendant apparently did know), the question of whether a warning about *dilute* dermal exposure was necessary is something of a red herring. If such a warning had been given about undiluted paraquat, then defendant could have raised the dilution issue in the context of the adequacy of the warning. Since no such warning was given, however, it is somewhat disingenuous for defendant to argue that it had no duty to give a warning about a lesser exposure because it was known to be less dangerous than a greater exposure—of which defendant also did not warn.

**25.** Although none of these were reported before 1979, however, plaintiffs raised some question about whether defendant might have had knowledge of at least one of these cases before it was reported in the medical literature.

**26.** In its reply memorandum, defendant resurrects its earlier argument that many of these cases "don't count," because they took place outside the United States and did not involve Chevron's U.S. label. This fact has absolutely no relevance to the causation issue, since the label is not a factor in the physical impact of paraquat in the body. Its importance to the notice issue is not much greater, since there was plenty of evidence that there was full sharing of information and incident reports among foreign and domestic sellers of paraquat.

legally sufficient warning in this case[27] —the fact that Mr. Ferebee's skin was apparently intact is irrelevant.

This is not a situation in which defendant is being charged with notice of an unforeseeable and drastically different type of illness. There was sufficient evidence to support the jury's finding that defendant knew, before 1979, that dermal exposure to paraquat could cause fatal lung disease.[28] Defendant might not, based on this evidence, be charged with a duty to warn about possible serious damage to other organs of the body by paraquat,[29] but a duty to warn about serious lung damage—of any type similar to that earlier reported—could be inferred.

### C. Causation

Chevron argues further that there was insufficient evidence to support the jury's finding that Mr. Ferebee's illness and resulting death were the proximate result of paraquat poisoning. They point to the very small number of cases of paraquat poisoning in the world, and argue that even these cases are so different from Mr. Ferebee's that his must be classified as "unique." As a unique case, defendant argues, Mr. Ferebee's case can be classified as paraquat poisoning only by the use of "unreasonable inferences" that are "at war with the undisputed facts." *Marcoux v. Van Wyk,* 572 F.2d 651, 653 (8th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

There were expert opinions on both sides of this issue. In such a situation, the weight to be given each expert opinion is exclusively for the jury. *Jenkins v. United States,* 307 F.2d 637, 646 (D.C.Cir.1962). Drs. Crystal and Yusuf were both experts eminently qualified in pulmonary medicine. They were both among Mr. Ferebee's treating physicians, a qualification shared by none of defendant's experts.[30] Moreover, the expert opinions they presented at trial were based on considerations going far beyond the statistics upon which defendant places such reliance. Each testified at length about the diagnostic tools he had used in Mr. Ferebee's case. Both agreed that cases like Mr. Ferebee's were rare, but Dr. Crystal identified three other cases that he felt to be nearly identical to Mr. Ferebee's, as well as many others that he considered to be similar in important respects. Dr. Crystal described each of Mr. Ferebee's symptoms and test results in detail, comparing each with similar results in other confirmed cases of paraquat poisoning. Dr. Crystal admitted under cross-examination that some of Mr. Ferebee's symptoms were different from the pattern established in many other cases of paraquat poisoning, but he explained many of these differences, quite plausibly, as attributable to the fact that Mr. Ferebee, unlike most paraquat victims, did not die immediately. Many of these additional symptoms, he explained, would develop more slowly and would not appear until the person had been ill—but still alive—for some time.

Defendant produced its own highly qualified experts on the causation issue, Drs. Fisher and Carrington. These experts explained in equal detail the considerations underlying their opinion that Mr. Ferebee's illness was not caused by paraquat. This testimony was substantial, but far from so overwhelming that the jury had no choice but to accept it. It was for the jury to decide which set of expert opinions to ac-

27. The jury could well have inferred from the evidence that minor cuts and abrasions are common enough occurrences for a person working with his hands in the fields and with tools that limiting a warning to users with broken skin might have sufficed, but that some warning of the lethal consequences of skin exposure was in order.

28. According to experts for both parties, lung damage is the classic result of paraquat poisoning caused by any type of exposure.

29. There was, of course, no evidence at trial that any organ other than the lung (and the skin at the point of exposure) is ever damaged seriously by paraquat.

30. Dr. Crystal, a government employee who is one of the leading experts in the United States on pulmonary fibrosis, testified voluntarily at the trial without remuneration.

cept, and they chose to accept those of Drs. Crystal and Yusuf.

### D. Dr. Fisher's Calculations and the Scientific Method

Dr. Fisher, one of defendant's experts, calculated what he believed to be the maximum amount of paraquat that could have entered Mr. Ferebee's body. Relying on animal studies and a few cases of paraquat poisoning of humans, he concluded that this amount was many times too small to have caused lung injury.

Defendants also argue, based upon the evidence of Dr. Carrington, that plaintiffs' experts did not base their conclusions upon proper scientific methodology, as is required of a medical expert. *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). Dr. Carrington stated that the only proper way to establish a medical hypothesis scientifically would be either to do a number of animal studies on the subject or to conduct a population study, surveying a large number of cases. Since cases of dermal paraquat poisoning of any kind are so rare, a population study is impossible, and, according to Dr. Carrington, animal studies have not yet been done in sufficient numbers to support the hypothesis that dermal exposure can cause this kind of disease.

It is true that medical expert testimony must be grounded in proper scientific methodology, but the extremely stringent standard that defendant suggests is beyond reason. Product liability law, especially as it relates to relatively new products or those with a relatively rare yet significant danger, would be rendered next to meaningless if a plaintiff could prove he was injured by a product only after a "statistically significant" number of other people were also injured. A civilized legal system does not require that much human sacrifice before it can intervene. The fact that this is the first case of this exact type—or at least the first of its exact type in which the involvement of paraquat was discovered by alert

doctors—cannot be enough by itself to shield defendant from liability. Defendant's experts were not able to fault Dr. Crystal for his basic diagnostic methodology; in fact, they used the same kinds of test results, consultations, and other tools that he did. What they disagreed with chiefly were his conclusions.

Defendant makes much of Dr. Fisher's testimony that:

I think [Dr. Crystal's theory] is new in the sense that I am not familiar with anyone who feels, as Dr. Crystal does, that these changes in these lung biopsies . . . are not perfectly compatible with idiopathic pulmonary fibrosis.

Tr. at 1176. Aside from the fact that Dr. Crystal did *not* deny that the lung biopsy was consistent with IPF,[31] the diagnosis of paraquat poisoning on the part of Mr. Ferebee's treating physician, which was not contradicted by any physician who actually treated—or even examined—Mr. Ferebee, cannot be held legally insufficient merely because a consultant for defendant claimed to know of no one (other than, presumably, plaintiffs' other experts), who agreed with him.

As for Dr. Fisher's calculation of the amount of paraquat absorbed by Mr. Ferebee's body, the Court is not convinced that it meets defendant's own rigorous scientific standards, since again no population study existed and no more than a handful of animal studies were available. Even more important, however, the human cases with which Mr. Ferebee was compared and which purported to demonstrate the amount of exposure that would cause lung damage all involved acute, short-term illness. Proof that a certain amount of paraquat is necessary to cause short-term illness cannot be held to demonstrate conclusively, as a matter of law, that the same amount is necessary to cause a chronic case like Mr. Ferebee's. Therefore, even though plaintiffs presented no equally specific evidence on exposure to contradict Dr. Fisher, it was

---

**31.** Dr. Crystal characterized the biopsy as unusual for IPF, but not inconsistent with it. It was only when he considered this test in conjunction with many other factors that he became confident of his diagnosis.

permissible for the jury to give this evidence less than conclusive weight.

### E. "Contradictions" in Dr. Yusuf's Testimony

Defendant argues that Dr. Yusuf's testimony was self-contradictory and therefore legally without effect. *Voss v. City of Baltimore,* 246 Md. 345, 228 A.2d 295 (1967). They point out that, during direct examination, Dr. Yusuf expressed his opinion on causation "to a reasonable degree of medical certainty," Tr. at 243, and that on cross-examination, the following was said:

Q. And am I also correct that you cannot rule out, to a reasonable degree of medical certainty that what Mr. Ferebee had was what we know in medicine as idiopathic pulmonary fibrosis?

A. I cannot rule it out.

Defendant argues that these two statements were contradictory, and therefore Dr. Yusuf's opinion was useless to support a verdict.[32]

This is one of a number of debater's points in which defendant seems to specialize. It is perfectly apparent to the reasonable observer what Dr. Yusuf meant by these statements. He was sure of his diagnosis, but like any good scientist, he was loathe to rule out any remotely rational hypothesis completely. The confusion, if there was any, was of defendant's own doing when defendant's counsel used the term "to a reasonable degree of medical certainty." It should be noted that counsel, not Dr. Yusuf, used these precise words to characterize his answer. This phrase was used over and over at trial in similarly awkward contexts because of defendant's insistence that all medical opinions of any kind must,

under Maryland law, use those magic words.

In fact, it was to disallow precisely this kind of question at the second trial that defendant took this position. Defendant convinced the Court after the first trial that it had been error to allow plaintiffs' counsel to ask defendant's experts if they could completely rule out paraquat as the cause of Mr. Ferebee's illness. The Court agreed that this type of question was improper, and that this flaw could not be cured by merely using the words "to a reasonable degree of medical certainty" in the question. As is clear from Dr. Yusuf's answer, these words do not significantly alter the question's meaning in the ears of the hearer, or if they do, they cause confusion.[33] If the Court committed any error here, it was in allowing defendant to ask this question in the first place.

### F. Causation: Reading the Label

Even if defendant had a duty to warn that dermal exposure to paraquat could cause death, defendant's liability for Mr. Ferebee's injury depends ultimately upon whether plaintiffs proved that the failure to give such a warning was the proximate cause of the injury. Defendant argues that there is overwhelming evidence that Mr. Ferebee did not read the paraquat label. Therefore, defendant argues, a different label, warning of the danger in great detail, would not have prevented the injury, since it, too, would have gone unread.

Plaintiffs answer this argument with two points. First, plaintiffs argue, Mr. Ferebee said that he *saw* the label, therefore the jury could infer that he *read* it. Second, plaintiffs point out that the adequacy of a

---

**32.** The Court is not certain why this argument is being made at all, since it was Dr. Crystal, not Dr. Yusuf, who was plaintiffs' principal expert witness. Even if this portion of Dr. Yusuf's opinion could not be allowed to stand, it would be harmless error. Moreover, defendant made no objection to this testimony at the time.

**33.** The fact that "reasonable degree of medical certainty" is not a normal term in the doctor's

vocabulary, was underscored during defendant's cross-examination of Dr. Crystal. In responding to a question about his conversation with another doctor, Dr. Crystal conscientiously expressed his answer in those terms only to be met with a sarcastic question from counsel for defendant: "Are those the words he used, 'within reasonable medical certainty'? Is that how you talk to other doctors?" Tr. at 683.

warning depends, not only on its content, but also on its ability to catch the eye, inducing the user to read it. Plaintiffs argue that this was also a jury issue and that the jury could have concluded that the label was not designed to attract the attention of a reasonably prudent person.

The Court has some difficulty in agreeing that a rational jury could have found either that Mr. Ferebee read the label or that the label was not adequately designed to attract attention. Neither of these questions have to be decided, however, for the simple reason that, contrary to defendant's argument, the proximate cause requirement does *not* rest entirely on whether Mr. Ferebee read the label.

█ Defendant cites a number of cases in which a plaintiff's failure to read the warning given absolved the seller of liability. The Court agrees that this is a sound principal in the run-of-the-mill product liability case in which all parties involved expect the warning label to be the principal source of information for the user about the product's uses and dangers. For example, both the purchaser and the seller of a child's pajamas would expect the principal, if not only, source of information about flammability would be contained in or on the pajamas themselves and the package in which they are distributed. If the purchaser would not have read the label in any event, the inadequacy of the warning given cannot by itself provide a basis for liability.[34] *Mattocks v. Daylin, Inc.,* 78 F.R.D. 663, 667–68 (W.D.Pa. 1978), *rev'd. and remanded on other grounds,* 611 F.2d 30 (3d Cir.1979).

Mr. Ferebee's situation was quite different, however. He did not purchase paraquat for his personal use; rather, it was provided to him by his employer for use on the job. The evidence showed that his principal source of information about paraquat was the oral instructions of his supervisors and co-workers, not the written label. He learned from them how to mix the product and how to spray it. It was also from this source that he learned of the danger of getting the product in his mouth: one of his co-workers warned him that if he accidently swallowed paraquat, it would "get in his blood" and poison him.

This is a common pattern of instruction and use of occupational materials in the workplace. Learning by doing and learning by oral instruction are tried and true methods of educating manual workers in their jobs.[35] Therefore, although it is crucial to plaintiff's case that *someone* would have read the label, it was not necessary for Mr. Ferebee to have done so. And it is obvious that *one or more employees at BARC did* read the label, since information did reach Mr. Ferebee about the proportions for diluting the product and about the dangers about which the label did warn. It was appropriate for the jury to infer that a warning about the danger of fatal lung disease from dermal exposure would also have been communicated to Mr. Ferebee.[36] *See* Restatement (Second) of Torts § 388 comment n (seller normally entitled to assume that adequate warning will be passed on by purchaser to ultimate user); *cf. Chambers v. G.D. Searle & Co.,* 441 F.Supp.

---

**34.** However, it should be no defense to a claim of an infant plaintiff who was burned by flammable garments that the infant could not read.

**35.** *Cf.* Restatement (Second) of Torts § 402A comment h (duty to warn of danger arising from a "particular use" that is foreseeable). The fact that many workers using a product ordinarily receive oral instructions from their supervisors has been used in some products liability cases to *insulate* the manufacturer from liability for a worker's injuries when the supervisor, but not the worker, received a warning of the danger. *See, e.g., Bryant v. Hercules, Inc.,* 325 F.Supp. 241 (W.D.Ky.1970).

**36.** The second half of the proximate cause issue, the question of whether Mr. Ferebee would have acted differently had he been warned of this danger, was answered by Mr. Ferebee himself, who testified that he would not have used paraquat at all if he had known the extent of the danger. Moreover, the jury could have inferred that the precautions imposed by Mr. Ferebee's employers might have been different had *they* known of the danger. For example, they might have required all workers using paraquat to wear protective clothing. They might have provided showers for use after spraying. Or they might have sought to substitute a different, less dangerous herbicide.

at 381 (in product liability case involving prescription drug, relevant warning is the one given to doctor, not patient).

## G. *Compliance with Federal Regulations*

■ Defendant also argues that the warning it provided on the paraquat label was adequate as a matter of law, because it complied with then-existing regulations of the Environmental Protection Agency.[37] There is no reason to reconsider this previously rejected argument. Pretrial Order at 4 (March 26, 1982); *Hubbard-Hall Chem. Co. v. Silverman,* 340 F.2d 402 (1st Cir. 1965); *Burch v. Amsterdam Corp.,* 366 A.2d 1079 (D.C.1979); *D'Arienzo v. Clairol, Inc.,* 125 N.J.Super. 224, 310 A.2d 106 (1973).[38]

## H. *Absence of Expert Testimony on Inadequacy of Label*

■ "Expert testimony is required when the subject presented is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982), *quoting Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981). Defendant cites this well-established principle in support of its argument that plaintiffs could not prevail in the absence of expert testimony on the adequacy of the label.

■ This argument is without merit. If defendant's proposed extension of the expert evidence rule were to be accepted, the entire premise of the American jury system would be undermined. The Court can think of no question more appropriately left to a common sense lay judgment than that of

whether a written warning gets its message across to an average person. After all, it is to the layman that the warning is addressed, not to the expert on labelling.[39] *See Billiar v. Minnesota Mining & Mfg. Co.,* 623 F.2d at 247 (applying New York law).

Effective labelling is no doubt a recognizable area of expertise. However, even an expert on the subject can decide whether a label is adequate only by measuring the reactions of average people. In this case, the parties performed the same analysis with a verdict form.

## I. *Misuse*

Finally, defendant argues that it cannot be held liable for Mr. Ferebee's injury because he misused the product. *See* Restatement (Second) of Torts § 402(A) comment j. Defendant had the burden of proof on this issue, and it is impossible for the Court to say that this burden was met as a matter of law.

Defendant pointed to the fact that the label gave instruction for use that would, if followed, have most likely prevented Mr. Ferebee's injury.[40] Since Mr. Ferebee did not follow all of these instructions when spraying outside, defendant argues that Mr. Ferebee misused the product.

■ The defendant is correct that one element of an adequate warning in this case would be a description of the precautions necessary to avoid the injury. But these instructions are effective only if the user knows what the result will be if he fails to follow them. *Billiar v. Minnesota Mining &*

---

37. These regulations have since been changed to require the label to warn against use by any but specially registered users. The exhibits prepared by defendant and the sample labels shown to the jury included this additional warning, but the jury was instructed that this warning was not on the containers used by Mr. Ferebee and was thus not relevant in this case.

38. The jury was instructed that, although compliance with federal labelling requirements does not by itself immunize a seller from liability, such compliance was "a fact for you to consider in deciding whether the label is adequate."

39. Defendant argued that Mr. Ferebee, as an agricultural worker, was a more sophisticated user than the average person. However, Mr. Ferebee was a manual laborer, and there is no evidence that he had any special training or experience that might have given the message on the label special significance.

40. For example, the label advised the user spraying paraquat to wear waterproof clothing and goggles, to avoid working in spray mist, and to wash splashes on the skin or eyes immediately with water.

*Mfg. Co.,* 623 F.2d at 247; *D'Arienzo v. Clairol, Inc., supra; Boyl v. California Chemical Co.,* 221 F.Supp. 669 (D.Ore.1963). If Mr. Ferebee was not warned that dermal exposure could seriously injure and even kill him, his failure to prevent that exposure cannot be deemed misuse. *See* Restatement (Second) of Torts § 402A comment n.

III. *Conclusion*

The standard for granting a judgment notwithstanding the verdict is a very strict one. *Boutros v. Riggs National Bank,* 655 F.2d 1257 (D.C.Cir.1981); *Law v. Virginia Stage Lines, Inc.,* 444 F.2d 990 (D.C.Cir. 1971). Plaintiffs are entitled to all reasonable inferences that can fairly be drawn from the evidence. The Court is satisfied that there is more than sufficient evidence to support the jury's finding that plaintiffs established each and every element of their case by a preponderance of the evidence and that, at the close of all the evidence, plaintiffs prevailed both on these issues and on the question of misuse. Accordingly, it is this 20th day of December, 1982, hereby

ORDERED: that defendant's motion for judgment notwithstanding the verdict should be, and hereby is, DENIED.