**Carl McNEAL, Appellant,**

v.

**HI–LO POWERED SCAFFOLDING, INC., an Ohio corporation, et al.**

No. 87–7036.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1987.

Decided Jan. 15, 1988.

Milton Heller, with whom J. Philip Kessel, Barbara Moir Condos and Michael A. Abelson, Washington, D.C., were on the brief, for appellant.

Read K. McCaffrey, with whom Keith A. Rosenberg and Christopher S. Lambert, Washington, D.C., were on the brief, for appellee.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Carl McNeal, a window washer, was seriously injured when he fell from a scaffold that had been suspended by two wire cables from the roof of a building in Washington, D.C. The cable holding the left side of the scaffold was secured by U-clips, wire rope clips manufactured by The Crosby Group, Inc. ("Crosby"). Just after McNeal boarded the scaffold, the left cable slipped through the U-clips, causing the scaffold to fall out from under him and his co-worker.

McNeal brought this diversity action against Crosby and several other defendants. The gravamen of his complaint against Crosby, which sounded in negligence, breach of warranty and strict liability, was that Crosby had failed to warn of the serious dangers presented by the improper application of U-clips. After a twelve-day trial, a jury returned a verdict for McNeal and against Crosby in the amount of $4.5 million.[1] Nearly four months later, the trial court granted Crosby's motion for judgment notwithstanding the verdict ("judgment n.o.v."), and conditionally granted Crosby's motion for a new trial if this court reversed the judgment n.o.v. *McNeal v. Hi–Lo Powered Scaffolding, Inc.*, No. 84–2561 (D.D.C. Jan. 28, 1987) ("Order"), *reprinted in* Record Excerpts ("R.E.") C–1.[2]

---

1. The jury also returned a verdict in favor of Hi–Lo Powered Scaffolding, Inc. ("Hi–Lo"), the manufacturer of the scaffold involved in the accident. Prior to trial, McNeal settled his claims against the building's owner and its management company.

2. Because the settling defendants were deemed a single contributing tortfeasor, the trial court also entered a conditional order reducing the judgment against Crosby by 50% if this court overturned the judgment n.o.v. and the order for a new trial. *McNeal v. Hi–Lo Powered Scaffolding, Inc.*, No. 84–2561 (D.D.C. Jan. 28, 1987) (conditional order on cross-claim of defendant Crosby), *reprinted in* R.E. C–3. McNeal does not appeal this decision, nor does he appeal the

Having reviewed all the evidence in the light most favorable to McNeal, we conclude that he adduced sufficient evidence for a reasonable juror to conclude that Crosby had a duty to warn of the dangers of improper application, that Crosby failed to provide an adequate warning, and that this breach of duty proximately caused McNeal's injuries. Therefore, the judgment n.o.v. is reversed. Because the trial court abused its discretion in conditionally ordering a new trial on the ground that the verdict was against the weight of the evidence, we vacate that order and direct the trial court to reinstate the jury's verdict.

## I. BACKGROUND

On March 23, 1984, McNeal and his co-worker, Leo Henson, were scheduled to wash the windows of a building located at 1333 H Street, N.W., in downtown Washington, D.C. McNeal and Henson were employees of American Window & Building Cleaning Contractors, Inc. ("American Window"), and each had over twenty years' experience as a window washer. They intended to use a scaffold suspended by two wire cables from the roof of the building. The cable holding the left side of the scaffold was attached to an outrigger, a semipermanent fixture on the roof, and the right side was attached to a cornice hook, a transportable device mounted on the roof. Each cable had an eye-splice—a loop formed by turning back the end of the cable and clamping it to the remaining portion with a wire rope clip—which was connected to these roof-top devices.

The eye-splice on the left cable was assembled with *U-clips*. A U-clip is a wire rope clip which has four components: a smooth, rounded piece of metal in the shape of a U ("U portion"), a corrugated piece of metal ("saddle") that presses down on the U portion, and two pairs of nuts and bolts. As the nuts are tightened, force is directed against the two pieces of wire cable held between the saddle and the U portion. The saddle has a configuration of grooves that creates interlock between it

and the cable. By contrast, the U portion has a smooth interior which provides no interlock.

When a U-clip is properly applied, the saddle is placed on the "live," load-bearing portion of the cable that runs to the scaffold, and the U portion is placed on the much shorter, "dead" end of the cable. Thus, a U-clip is "backwards"—or improperly applied—when the saddle is placed on the dead end rather than on the live end. Crosby sells U-clips by the box, with each box containing 100 U-clips. Normally, one application card containing directions and warnings about U-clips is enclosed in each box.

The eye-splice on the right side of the scaffold was assembled with *fist clips*, another type of wire rope clip manufactured by Crosby. Unlike U-clips, fist clips have no smooth portion; they have two saddles and two pairs of nuts and bolts. As a result, they cannot be put on backwards. For this reason, fist clips are sometimes referred to as safety clips or twin base clips. Each fist clip is sold individually and comes with its own instruction card.

American Window purchased most of its scaffolding equipment from AA Ladder & Supply Corp. ("AA Ladder") from the early 1970s until 1982. During that time, AA Ladder had a policy of never selling or applying U-clips. Unless otherwise requested, it assembled eye-splices by means of a nico press sleeve.[3] If a customer asked for wire rope clips, AA Ladder sold or assembled fist clips, not U-clips. In 1982, American Window started purchasing some of its rigging equipment from Approved Equipment, Inc. ("Approved Equipment"), which had been opened that year by Richard Parkerson, a former employee at AA Ladder. Until 1984, Parkerson followed AA Ladder's policy on the use of wire rope clips. An exception was made in early 1984 after American Window placed an order for cables and wire rope clip assemblies.

---

trial court's denial of his motion for a new trial against Hi–Lo.

**3.** Nico press sleeves, unlike wire rope clips, are permanent clamps.

At the time American Window placed this order, Approved Equipment was running low on fist clips. Parkerson telephoned Crosby's warehouse to inquire about replenishing his stock. A Crosby official told Parkerson that fist clips would be unavailable for several weeks, and suggested that he use U-clips instead. Parkerson agreed, and Crosby shipped him a box of 100 U-clips. Parkerson testified that this box did *not* contain an application card, nor did it contain instructions or warnings of any other kind.

Parkerson and his son attached three U-clips to the wire cable that would eventually support the left side of the fated scaffold. Parkerson testified at trial that he had never used U-clips prior to this time, and that when he and his son made the assemblies for American Window, neither of them knew that "there was a right way and a wrong way to apply the U-clips." Transcript ("Tr.") at 979. Parkerson also testified that he checked the tightness of the U-clips with a ratchet wrench. On March 8, 1984, American Window purchased the U-clip assemblies from Approved Equipment.

Late in the afternoon on March 21, 1984, McNeal and Henson rigged a scaffold to the building where the accident occurred. One of the U-clip assemblies purchased from Approved Equipment supported the left side of the scaffold, and a fist clip assembly supported the right side. Neither McNeal nor Henson made any adjustment to the U-clips or the fist clips. The next day Henson and Earl Lewis, another window washer at American Window, used the scaffold to make five or six trips, or "drops," down the side of the building. Lewis later testified that he had never seen U-clips before that day, and that he was familiar only with fist clips. Because he was concerned about the U-clips, he tightened them with pliers before three or four of the drops.

On the morning of March 23, 1984, Henson was the first to board the scaffold, where he waited for about five minutes before McNeal joined him. McNeal began his descent on the U-clip side of the scaffold by facing the building and lowering himself down the wire cable. He eventually placed his feet on the stirrup that was connected to the left side of the scaffold before stepping down onto the platform. Seconds later McNeal heard a noise, looked up, and saw the left cable unwinding around the outrigger. The scaffold then slid out from under McNeal and Henson, causing their fall. McNeal was seriously injured and Henson was killed. Because the fist clips held, the scaffold was left hanging vertically from the right cable.[4]

At trial, McNeal testified that he did not check the tightness of the U-clips or the fist clips before he began his descent. He noted, however, that the standard "policy" among window washers was for the first person to board the scaffold to check the tightness of the wire rope clips. Tr. at 774. He further testified that he knew how to use fist clips, but had no experience whatsoever with U-clips. McNeal also stated that he had never seen an application card pertaining to U-clips, that he had never received instructions about their proper use, and that he had never been warned about the danger posed by backwards application.

## II. ANALYSIS

### A. *The Standard of Review*

In reviewing the trial court's decision to grant Crosby's motion for judgment n.o.v., this court asks

> the same question that the district court asked initially in considering the motion. Because a motion for judgment n.o.v. intrudes upon the jury's domain, that question is very narrow. The jury's verdict must stand unless "the evidence, to-

4. McNeal was unable to attach his safety line before he began his descent because the scaffold was ten to twelve feet below the roof line. The trial court found that the building's owner and its management company had been negligent in allowing Henson and Lewis to leave the scaffold in that position at the end of the day on March 22. *McNeal v. Hi–Lo Powered Scaffolding, Inc.,* No. 84–2561 (D.D.C. Jan. 28, 1987) (conditional order on cross-claim of defendant Crosby), *reprinted in* R.E. C–3.

gether with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict."

*Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir.1984). We are required "to consider all the evidence and to do so in the light most favorable to the successful party below. Conflicts in the evidence must be resolved in favor of the prevailing party." *Grogan v. General Maintenance Serv. Co.*, 763 F.2d 444, 447 (D.C.Cir.1985) (citation omitted). Because we ask the "same question" asked by the trial court, we owe no deference to, and are not guided by, its decision.

### B. *Failure to Warn*

Regardless whether McNeal's failure-to-warn claim is phrased in terms of negligence, breach of warranty or strict liability, the analysis under D.C. law is basically the same. *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 719–21 (D.C.1985); *Russell v. G.A.F. Corp.*, 422 A.2d 989, 991 (D.C.1980) (per curiam); *see also Young v. Up–Right Scaffolds, Inc.*, 637 F.2d 810, 814 (D.C.Cir.1980) (applying D.C. law). Under all three theories, "the general rule [is] that the supplier of a product is liable to expected users for harm that results from foreseeable uses of the product if the supplier has reason to know that the product is dangerous and fails to exercise reasonable care to so inform the user." *Payne*, 486 A.2d at 721.[5]

This general rule encompasses the essential elements of tort liability. To recover, McNeal had to prove by a preponderance of the evidence that: (1) Crosby owed him a duty; (2) Crosby breached that duty; and (3) the breach of duty proximately caused his harm. We shall analyze each of the elements of McNeal's claim in turn, mind-

ful that this court's role "is to decide a case as we think a D.C. court would decide it." *Young*, 637 F.2d at 814.

### 1. *The Duty to Warn*

■ The threshold question in a failure-to-warn case is "whether a duty to warn exists." *Hull v. Eaton Corp.*, 825 F.2d 448, 454 (D.C.Cir.1987) (per curiam) (applying D.C. law). In the District of Columbia that determination turns on whether the manufacturer "knew or should have known of a danger sufficiently serious to require a warning." *Russell*, 422 A.2d at 992; *see also Hull*, 825 F.2d at 455 ("risk [that] was both foreseeable and sufficiently serious"). A plaintiff need not show that there was a manufacturing defect in order to recover: "[a] product can be perfectly made and still require directions or warnings on proper use in order to be safe." *Russell*, 422 A.2d at 991.

In the instant case, McNeal introduced evidence at trial that amply demonstrates that U-clips present a serious risk of danger because of the significant diminution in holding power caused by backwards application. For example, according to the Construction Safety Association Rigging Manual, a widely-read handbook in the rigging industry to which Crosby had contributed information, a backwards U-clip "can reduce the efficiency of the connection to 40%." Tr. at 1342.[6]

Edward Cole, a safety specialist from the D.C. Department of Occupational Health and Safety, investigated the accident. He testified that, because so many accidents had been caused by backwards U-clips, his former office director distributed cards that contained drawings depicting the prop-

---

**5.** This is not to say, however, that the causes of action are identical. For example, contributory negligence is a defense in a negligence suit, but not in a strict liability action. *Payne*, 486 A.2d at 721 n. 9; *see also Young*, 637 F.2d at 814.

The trial court noted that "[t]he concept of strict liability has not been fully developed in this jurisdiction." Order at 3. While this may be true as a general proposition, *see Hull v. Eaton Corp.*, 825 F.2d 448, 453 (D.C.Cir.1987) (per curiam) (no case "clearly set[s] out the

necessary elements of a D.C. strict liability claim"), the elements of a failure-to-warn strict liability claim are the same as those of a failure-to-warn negligence claim, and the elements of the latter claim *are* fully developed.

**6.** Crosby does not challenge this figure. *See* Brief for Appellee at 11, 30. The efficiency of a connection is measured in terms of the catalogue breaking strength of the cable.

er and improper way to apply them. The cards also included the following warning:

AN INCORRECT CABLE CONNECTION CAN REDUCE THE EFFICIENCY TO 30%! WHY GAMBLE WITH YOUR LIFE?

Plaintiff's Exhibit 67, *reprinted in* R.E. D–3. Robert Wolfe, a mechanical engineer who was contacted by the building's management company to investigate the accident, also testified that a U-clip's holding power is significantly reduced when it is improperly applied.

Crosby's own U-clip application cards strongly support this view. These cards contain the following two warnings:

Turn back the specified amount of rope.... Apply the first clip one base width from the dead end of the wire rope (U-bolt over dead end—live end rests in clip saddle)....

IMPORTANT—FAILURE TO MAKE A TERMINATION IN ACCORDANCE WITH INSTRUCTIONS, OR FAILURE TO PERIODICALLY CHECK AND RETIGHTEN TO THE RECOMMENDED TORQUE, *WILL* CAUSE A REDUCTION IN THE EFFICIENCY RATINGS.

Plaintiff's Exhibit 8, *reprinted in* R.E. D–5 (emphasis added).[7]

In light of the reduction in holding power caused by backwards application, it is not surprising that the Scaffolding and Shoring Institute, a nationwide organization of manufacturers that sets standards for suspended powered scaffolds, has promulgated a "safety requirement" that provides: "If wire rope clips are used, they shall be of the twin base type." Tr. at 584. Likewise, the major manufacturers of powered scaffolds in the United States, with the exception of Hi–Lo, recommend that U-clips not be used. Hi–Lo's manual simply refers to the use of "proper fittings." Tr. at 395.

The American National Standards Institute ("ANSI") took matters one step further when, in 1970, it issued a standard which prohibits the use of U-clips or fist clips to suspend scaffolds for exterior building maintenance. Tr. at 469–70. In 1974, this standard was incorporated by reference into regulations promulgated by the Occupational Health and Safety Administration ("OSHA"). *See* 29 C.F.R. § 1910.66(b)(5)(iii) (1986). Lawrence Stafford, who served as president of the relevant ANSI committee from 1974 until 1985, testified that the window washing industry continued to use fist clips after the OSHA regulation was adopted, and that ANSI was considering amending its standard to permit their use. He emphasized, however, that ANSI intended to maintain its ban on U-clips.

Given the foregoing, a reasonable juror easily could have concluded that Crosby was fully aware of the danger presented by the backwards application of U-clips. While the risk posed might not be great when U-clips are used to support light or inanimate objects, a significant risk exists when window washers are suspended several stories off the ground. Crosby does not contend that it was unaware of the danger posed by backwards application.[8] Instead, Crosby argues that it did not have a duty to warn because McNeal's superiors at American Window were sophisticated U-clip users.[9]

This argument is without merit. It is true that Eugene Sandler, American Window's president, and Earl Sullivan, McNeal's supervisor, testified at trial that they were familiar with the proper application of U-clips. But, Sandler stated in his sworn deposition, later read into evidence

---

7. With respect to the 5/16-inch U-clips involved in the accident, the application cards recommend a minimum of two clips, 5¼ inches of turned-back cable, and 30 foot-pounds of torque. The application cards claim that properly applied 1/16-inch U-clips will support 80% of a wire cable's catalogue breaking strength. *Id.*

8. Crosby states in its brief that, in order to achieve "proper placement" of a U-clip, "[t]he saddle should be placed on the 'live' end of the wire rope to which it is applied rather than on the 'dead' end." Brief for Appellee at 9.

9. *See Payne,* 486 A.2d at 723 (duty to warn " 'cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use' the product").

at trial,[10] that he had "virtually no experience with [U-clips]," Tr. at 1472, and that he did not know that there could be a "correct way or an incorrect way" to apply them. Tr. at 1470. And, Sullivan testified that in the decade preceding the accident, American Window had only used fist clips when it employed wire rope clips. Tr. at 1491, 1493. AA Ladder's president, Howard Koss, concurred by noting that from the mid–1970s onwards his company had only assembled or supplied fist clips or nico press sleeves for American Window. Tr. at 196. A reasonable juror could have concluded, therefore, that Sandler and Sullivan were not sophisticated users of U-clips. If anything, the record suggests only that they were sophisticated users of *fist clips*.[11]

On the evidence presented, there is more than enough to support a duty to warn.

### 2. *The Adequacy of the Warning*

■ If a manufacturer has a duty to warn of the foreseeable dangers of its product, a warning must be provided "which adequately advises the user of attendant risks and which provides *specific* directions for safe use." *Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1086 (D.C.1976) (emphasis in original); *see also Payne*, 486 A.2d at 723. The degree of specificity required is a function of the potential magnitude of the harm and the likelihood of its occurrence. *See Russell*, 422 A.2d at 992; *Burch*, 366 A.2d at 1087 n. 24. Given the fact-specific nature of the inquiry, a determination of the adequacy of a warning, particularly in cases in which there is a potential for serious injury, is normally one for the jury. *Burch*, 366 A.2d at 1086–87.

In a typical failure-to-warn case, a warning of some kind is provided in the form of a manual, *see, e.g., Payne*, or a label, *see, e.g., Burch*, to give but two examples. This case presents a wholly different scenario, of course, since *no* warning—in the form of an application card or otherwise—was provided to anyone at Approved Equipment or American Window, not least McNeal. The trial court *never* mentioned this undisputed fact, and it asserted without citation or explanation that "[a]dequate warnings as a matter of law were given by the defendant Crosby." Order at 2.

In its brief, Crosby attempts to deal with this glaring problem by claiming that "the warnings and instructions issued by Crosby clearly reached, at a minimum, McNeal's employer." Brief for Appellee at 45. Crosby seems to be referring to catalogues and engineering journals that it claims it provided to Approved Equipment when it became a Crosby distributor in 1982. The catalogues, however, merely remind users to consult an application card. As for the engineering journals, which apparently contain specific instructions on the use of U-clips, it is not clear from the record that Approved Equipment ever received one.[12] The trial court took Crosby's argument one step further by finding that adequate warnings were provided in "the various

---

10. Federal Rule of Evidence 801(d)(1) allows this prior sworn testimony to come in as substantive evidence.

11. The trial court's analysis of the duty to warn issue is unpersuasive, and it plainly offers no proper grounds upon which to justify taking the case from the jury. The trial court held that, as a matter of law, there was no duty to warn someone "to tighten a nut on a bolt, which was an obvious characteristic of defendant's product, and a known danger." Order at 1. We disagree with this obvious mischaracterization: "Calling a Crosby 'U' clip a mere nut and bolt ... ignores the hidden danger ... of inadvertent misapplication." Brief for Appellant at 35.

The trial court also accepted Crosby's argument that "[t]he evidence established that the plaintiff's employer was a knowledgeable and sophisticated user of the Crosby 'U' bolt wire

clip." Order at 2. The court attempted to justify its finding, in part, by noting that Lewis had testified that "the workers carried tools to maintain proper scaffolding, including the tightening of bolts." *Id.* Lewis also testified, however, that he had never seen a U-clip before March 22. Moreover, the workers' knowledge is irrelevant to what their employer knew about U-clips. Similarly, the trial court's observation that McNeal and others at American Window were experienced users of scaffolding and rigging equipment certainly does not demonstrate that anyone at American Window was specifically familiar with U-clips.

12. Even if Approved Equipment had received a journal, it would have arrived two years before the accident—a time when it did not use U-clips.

rigging manuals." Order at 2. This view is untenable. There is no evidence to suggest that anyone at Approved Equipment or American Window ever consulted these manuals. Moreover, the one manual that they were likely to have consulted, the Hi–Lo manual, implicitly approved the use of U-clips, and did not provide directions on their proper application.

Finally, the trial court attempted to buttress its finding that adequate warnings were provided by referring to "an OSHA regulation as to how to apply the 'U' bolt wire rope clip." Order at 2. As noted earlier, however, there is *no* OSHA regulation that provides directions on the use of U-clips. Quite the contrary, OSHA regulations implicitly prohibit their use![13] The trial court's reasoning on this point is difficult to comprehend.

Given that neither warnings nor instructions were provided to anyone at Approved Equipment or American Window, a reasonable juror would have had little trouble concluding that Crosby did not provide an adequate warning in this case.

### 3. *Proximate Cause*

█ The next inquiry is whether the accident was proximately caused by Crosby's failure to provide adequate warnings. In the District of Columbia, "[p]roximate cause encompasses both foreseeability of injury, and the decision that liability will not attach unless the breach of duty has a substantial and direct causal link to the plaintiff's injury." *District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984) (citations omitted). A plaintiff must introduce evidence which affords a reasonable basis for the belief that it is "more likely than not that the conduct of the defendant[ ] was a *substantial factor*" in bringing about the harm at issue. *Lacy v. District of Columbia,* 424 A.2d 317, 318 (D.C. 1980) (emphasis in original) (quoting with approval the trial court's jury instruction). In most cases, "the existence of proximate cause is a question of fact for the jury." *Freeman,* 477 A.2d at 716.

The thrust of Crosby's argument is that McNeal failed to introduce evidence that demonstrated that improperly applied U-clips "caused *this* accident." Brief for Appellee at 29 (emphasis in original). In Crosby's view, the U-clips failed on March 23 because the nuts were loose; consequently, a warning about backwards application would not have served any purpose.[14]

The primary problem with this argument is that, except for the testimony of one expert,[15] Crosby is unable to cite anything in the record that suggests that the U-clips were loose on the day of the accident. By contrast, the following evidence, none of which was disputed by Crosby, clearly supports the inference that the U-clips were *not* loose on the day of the accident: Parkerson tightened the U-clips when he prepared the assembly; Lewis tightened the U-clips at least three times on the day preceding the accident;[16] and McNeal tes-

---

**13.** *See* 29 C.F.R. § 1910.66(b)(5)(iii) (1986) (as previously noted this regulation incorporates by reference an ANSI standard that bans U-clips for exterior building maintenance).

**14.** Even though Crosby never defines "loose," it is safe to assume that it is something less than 30 inch-pounds (*i.e.,* finger-tightness), since Crosby asserts that the U-clips would have held if they had been torqued to that amount.

**15.** Bernard Enfield, an engineering consultant, testified that the absence of kinks in the left cable and markings on the U-clips "led [him] to believe" that the U-clips had not been tightened. Tr. at 1563. As far as we can tell from the record (and Crosby does not suggest otherwise), Enfield was the *only* witness who claimed that he could not see any kinks in the left cable.

Although Wolfe also testified that the U-clips "were not tightened sufficiently," he added that

he "[had] no way of knowing [how that occurred]." Tr. at 234. He also testified: that a backwards U-clip holds less load than a properly applied U-clip, Tr. at 235; that U-clips are "certainly more dangerous" than fist clips, Tr. at 239; and that "it would be much easier to envision a situation where [the U-clips] would slip if they were put on backwards than if they were put on properly." Tr. at 233. A reasonable juror could have interpreted Wolfe's testimony, on the whole, as supporting McNeal's theory of causation.

**16.** Since the application cards only recommend that U-clips be tightened "periodically," a reasonable juror could have inferred that the nuts had not loosened between the time Lewis tightened them on March 22 and the accident the next day.

tified that he assumed that Henson abided by custom and checked the U-clips when he boarded the scaffold.[17]

In addition, Kenneth Self, Crosby's technical specialist who conducted post-accident tests on U-clips, testified that there were kinks in the left cable and that they could not have been produced by U-clips torqued only to 30 inch-pounds (*i.e.*, finger-tightness). Finally, that the fist clips on the right cable managed to maintain their grip suggests that they had been tightened, which in turn suggests that the U-clips had also been tightened. Why would anyone tighten only the clips on the right cable?

McNeal introduced substantial evidence to support his primary proposition—that the U-clips were on backwards. After Lewis was shown both a properly applied U-clip and an improperly applied U-clip at trial, he testified that the latter resembled the position of the U-clips on the day before the accident. Self testified that he conducted tests with the clips on backwards because Crosby officials believed that the clips were misapplied on the day of the accident.

Furthermore, McNeal established at trial that U-clips are normally applied inches from the terminus of the dead end of the cable, and that kinks in the cable are nor-

mally produced by the U portion of a U-clip. Thus, a properly applied U-clip would produce kinks, if at all, near the terminus of the dead end. Since in this case there were prominent kinks at least a foot from the end of the cable, Wolfe, Stafford and James Sullivan, an OSHA inspector who also conducted an investigation of the accident, inferred that the U portion of the U-clips had been mistakenly applied to the live portion of the cable. None of Crosby's witnesses seriously challenged this proposition.

Not only is there abundant evidence in the record that the U-clips were improperly applied on the day of the accident, but, as discussed in Section II.B.1 *supra,* such application significantly reduced the U-clips' holding power. From these circumstances, a reasonable juror could have concluded that the backwards application of the U-clips was "more likely than not ... a *substantial factor*" in causing the accident. *Lacy,* 424 A.2d at 318 (emphasis in original).[18] Moreover, as discussed in Section II.B.2 *supra,* a reasonable juror could have found that McNeal proved that Crosby failed to warn of the danger posed by misapplication, and "that his injury grew out of the risk caused by that danger." *Payne,* 486 A.2d at 725.[19]

---

**17.** Common sense suggests that a custom would exist whereby the first person to board a scaffold ensures that the rigging is secure. Moreover, in the absence of evidence to the contrary, a decedent is presumed to have acted with due care in accordance with the human instinct of self-preservation. *See Eastern Air Lines v. Union Trust Co.,* 221 F.2d 62, 72 (D.C.Cir.1955), *rev'd on other grounds,* 350 U.S. 962, 76 S.Ct. 429, 100 L.Ed. 835 (1956).

**18.** Crosby itself introduced test results that demonstrate that if properly applied U-clips are tightened only to 30 inch-pounds, they will hold upwards of 8,000 pounds, while backwards U-clips tightened to the same amount will slip at weights ranging from 462 pounds to 2,126 pounds. The scaffold weighed approximately 1,000 pounds and was supported by two cables on the day of the accident. Although there was some confusion surrounding these test results, a reasonable juror could have inferred from this evidence that backwards application resulted in a critical lessening of the U-clips' holding power and thus was a substantial factor in causing the accident.

Crosby claims that McNeal's experts failed to testify as to the ultimate issue of causation. This is incorrect. In response to a series of questions, Stafford stated: that U-clips are "unreasonably dangerous" because of the risk of backwards application; that the U-clips were on backwards in this case; and that the U-clips "were the cause of the eye splice failure." Tr. at 443. In any event, we are unaware of any rule that a plaintiff's experts must provide an opinion on the precise cause of an accident. Rather, a juror is entitled to evaluate the evidence, draw inferences, and reach her *own* conclusion.

**19.** Under District of Columbia law, a "rebuttable presumption [exists] ... that the user would have read an adequate warning, and that in the absence of evidence rebutting the presumption, a jury may find that the defendant's product was the producing cause of the plaintiff's injury." *Payne,* 486 A.2d at 725. Crosby has not advanced any evidence that suggests that McNeal would not have heeded an adequate warning. Furthermore, we note that the trial court's analysis of the legal presumption was completely at odds with District of Columbia law. Order at 3–4.

### 4. Intervening Cause and Product Misuse

■ Crosby argues that, even if it breached its duty to provide an adequate warning of the dangers of backwards application, this breach was not the proximate cause of the accident, since it was "superseded by the actions of those who assembled, rigged and maintained the equipment." Brief for Appellee at 41. The trial court agreed. Order at 4. We disagree.

A manufacturer's failure to warn need not be the sole cause of an injury; rather, a "manufacturer may still be held liable even though other causes proximately contributed to the injury." *Payne,* 486 A.2d at 726. And, "where harmful consequences are brought about by intervening, independent forces ... whose operation could have been foreseen, the chain of causation extending from the original act ... is treated as a proximate cause." *Id.* Not surprisingly, this inquiry is normally "a question for the trier of fact." *Id.*

In the instant case, Crosby was cognizant of the risks posed by improperly applied U-clips, and of the consequences of its failure to convey instructions and warnings about their safe use. Since Approved Equipment and American Window never received an application card, their failure to ensure proper rigging was entirely foreseeable. Certainly, this failure is not so " 'highly extraordinary in retrospect' " that Crosby's failure to warn should be deemed superseded. *White v. United States,* 780 F.2d 97, 106 & n. 29 (D.C.Cir.1986) (applying D.C. law).

Likewise, McNeal should not be barred from recovery because of his alleged "misuse" of the U-clips. "[M]isuse is use of a product in a manner not reasonably foreseen by the defendant." *Young,* 637 F.2d at 815. Since McNeal never received instructions or warnings about the proper use of U-clips, the possibility that he might fail to employ a correct assembly was reasonably foreseeable by Crosby.

In this regard, the trial court surprisingly suggested that, "even if the evidence is sufficient to warrant a jury finding that [the U-clips were] on backwards, the manufacturer cannot be held responsible for the misuse on the record before this Court." Order at 2. This comment overlooks the fact that McNeal did not know that there was a right way or a wrong way to apply the Crosby U-clip. In addition, it obfuscates the misuse analysis by shifting the emphasis from the foreseeability of McNeal's actions to whether McNeal was somehow negligent.

### C. The Conditional Order for a New Trial

■ The decision whether to grant a motion for a new trial is ordinarily "entrusted to the sound discretion of the trial court," *Grogan,* 763 F.2d at 447, and should be reversed on appeal only if that discretion has been abused. When the trial court has denied a motion for a new trial, an appellate court's scope of review is particularly limited, since the trial court's decision accords with that made by the jury. *See Hobson v. Wilson,* 737 F.2d 1, 58 n. 160 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). By contrast, when the trial judge grants a motion for a new trial, a more searching inquiry is required to prevent the trial court from "encroach[ing] on the jury's important fact-finding function." *Vander Zee v. Karabatsos,* 589 F.2d 723, 729 (D.C. Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979).

In cases where a new trial is ordered, "the degree of appellate scrutiny should depend on the reasons given for the awarding of a new trial." *Id.* at 728. When the trial court "has ordered a new trial because of legal error," *id.* at 729, or because "confusing testimony and events created a potential for injustice," *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835, 849 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982), the trial court's decision will ordinarily be affirmed. If, however, a new trial is granted on the ground that the verdict was against the weight of the evidence:

> the [trial] judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes

---

the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

*Lind v. Schenley Indus.*, 278 F.2d 79, 90 (3d Cir.) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), *cited with approval in Vander Zee*, 589 F.2d at 728–29; *see also Schneider*, 658 F.2d at 849.

■ In the instant case, the trial court concluded that the jury's verdict was against the weight of the evidence. *See* Order at 5. The court did not explain *why* this was so, except to say that there was "insufficient evidence to show that the 'U' bolts on backwards would not hold, if tightened." Order at 3. To the contrary, there was substantial evidence from which a reasonable juror could conclude that backwards U-clips would not hold if only finger-tightened. Since the trial court's decision to grant a new trial was based on the same flawed reasoning that led to its ruling on the judgment n.o.v., it abused its discretion when it conditionally ordered a new trial.

### III. Conclusion

Viewing the evidence in the light most favorable to McNeal, we conclude that a reasonable juror could have found that he proved all of the elements of his failure-to-warn claim. As a result, the trial court erred when it granted Crosby's motion for judgment n.o.v. Because the trial court did not adequately justify its conditional grant of a new trial, the conditional order for a new trial is vacated and we direct the trial court to reinstate the jury's verdict.[20]

---

20. Since McNeal does not appeal the trial court's decision reducing the judgment against Crosby by 50%, his judgment should be reduced accordingly.