**EAST PENN MANUFACTURING COMPANY, Appellant,**

v.

**Francisco R. PINEDA, et al., Appellees.**

**LEETH BROTHERS, INC., Appellant,**

v.

**Francisco R. PINEDA, et al., Appellees.**

**Nos. 88–885, 88–886 and 88–966.**

District of Columbia Court of Appeals.

Argued Feb. 5, 1990.
Decided July 18, 1990.

Michael D. Maloney, with whom James C. Gregg, Washington, D.C., was on brief, for East Penn Mfg. Co. appellant in Nos. 88–885 and 88–966.

William J. Donnelly, Washington, D.C., for Leeth Bros., Inc., appellant in No. 88–886 and appellee in No. 88–966.

Edward L. Norwind, Washington, D.C., for Francisco R. and Gladys Pineda, appellees in Nos. 88–885 and 88–886.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

A jury returned a verdict in favor of Francisco R. Pineda and his wife on the "failure to warn" count of their product liability claim against the manufacturer and seller of a commercial truck battery. The jury found that the warning label affixed to the battery was inadequate to apprise Pineda—a truck mechanic partially blinded after the battery exploded—of the risks associated with charging the battery, and that the inadequate warning proximately caused his injuries. On this consolidated appeal, East Penn Manufacturing Company (East Penn) and Leeth Brothers, Inc., the manufacturer and seller of the battery, respectively, contend that because Pineda was an experienced user of the

product in question and aware of its potential dangers, they had no duty to warn him that the battery might explode if handled in the manner he employed. They further argue that the warning on the label was adequate as a matter of law. East Penn also asserts that the allegedly inadequate warning could not have proximately caused Pineda's injury because he did not read the label and would not have altered his behavior even if he had. Finally, East Penn challenges the trial court's order granting judgment on Leeth Brothers' cross-claim for indemnity, arguing that the rule of manufacturer "pass through" liability is inapplicable because Leeth Brothers re-labelled the battery, sold it as its own, and was equally aware of potential dangers.

Our previous decisions indicate that fact-intensive issues concerning the existence of a duty to warn and whether the warning was sufficiently specific to discharge the duty are generally reserved for the jury, and may be resolved as a matter of law only when the evidence would not permit differences of opinion by reasonable jurors. The jury here confronted conflicts in the testimony bearing on these questions, and we hold that it permissibly resolved them in Pineda's favor. Despite Pineda's failure to read the label, we also decline to reverse on the basis of insufficient proof of proximate causation; applying *Payne v. Soft–Sheen Products*, 486 A.2d 712 (D.C.1985), we hold that the jury could reasonably infer that information on an adequate label would have been communicated to and heeded by Pineda, and that the deficient label therefore proximately caused his injury. Finally, we affirm the judgment on Leeth Brothers' cross-claim for indemnity: because the manufacturer was in a superior position to Leeth Brothers to identify and warn against the particular risks associated with charging and jump-starting batteries—the latter's fault consisting only of failing to discover the substantive inadequacy of the warning—we conclude that Leeth Brothers was entitled to indemnity from East Penn.

**1.** The truck's battery unit was not configured in the same manner as an ordinary automobile—

## I.

### A. The Facts

In November 1983, Pineda was employed as lead mechanic at Callaham's Refuse Company in charge of keeping the company's fleet of refuse trucks in operating condition. The trucks were powered by large diesel engines and prone to starting difficulties; jump-starting and recharging batteries were therefore commonplace. On the morning of November 21, 1983, a 1977 Ford refuse truck would not start. A co-worker of Pineda's, Galvez, attached a battery charger to the Ford's battery system,[1] and after letting the Ford batteries charge for a while, tried to start the vehicle but to no avail. The driver of the Ford then tried to jump-start the truck by connecting jumper cables from the positive and negative terminals of the Ford to those of a Mack truck with the engine running, also without success.

When Pineda reported to work at about this time, his supervisor told him the Ford would not start and asked him to remedy the situation. Pineda noticed Galvez taking a battery charger away from the Ford but was unaware what he was doing with it. He began working on the Ford minutes after his arrival, and no one told him of Galvez' attempt to charge the battery. He checked to see that cables joining the Ford and the Mack truck were secure and properly connected for a jump-start—positive terminal to positive terminal and negative terminal to negative—and had the driver of the Ford attempt to start it. He waited another three or four minutes before asking the driver to try again, then removed the jumper cables. Intending to remove the battery cables from their terminals on each of the four batteries and test the batteries in place, he loosened the positive lead on one battery from its terminal with a pair of pliers, wrapping it in a piece of cloth for insulation and twisting it aside. As he began to loosen the negative lead, the battery exploded. The top of the battery case was blown apart and Pineda was

with a single battery—but contained four 6–volt batteries connected in series.

struck in the face with battery acid and case fragments, causing near-total blindness in his right eye.

Callaham's had purchased the battery one month earlier from Leeth Brothers. Its exterior components—casing, top and vent caps—were manufactured by the Richardson Company. East Penn manufactured the plates and electrolyte solution, assembled the battery, and sold it to Leeth Brothers. As assembled and sold by East Penn, the battery bore a white warning label about the size of a business card. Before selling the battery, Leeth Brothers affixed a larger yellow label ($7\frac{3}{4}'' \times 2\frac{7}{8}''$) bearing its trade-name "Express", punch-out discs showing the date and year the battery was purchased, and the following warning which was identical to that on the smaller label provided by East Penn:

## POISON/DANGER CAUSES SEVERE BURNS

KEEP OUT OF REACH OF CHILDREN

Contains sulfuric acid.—Avoid contact with skin, eyes or clothing. Antidote: EXTERNAL—Flush with water. INTERNAL—Drink large quantities water or milk. Follow with milk of magnesia, beaten egg or veg. oil. Call physician immediately. Eyes: Flush with water for 15 minutes and get prompt medical attention. Batteries produce explosive gases. Keep sparks, flame, cigarettes away. Ventilate when charging or using in enclosed space. Always shield eyes when working near batteries.

The content of the warning had been determined by East Penn based upon standards promulgated by the Battery Council International.

In deposition Pineda testified that he had read the label on the battery and understood that sparks from a jumper cable could ignite explosive gases. On cross-examination at trial, however, he explained that he had read warnings on other batter-

ies but not the particular one that exploded,[2] because it had "dust ... on top of it."

Pineda was a mechanic with approximately twenty years of experience on a variety of vehicles, though without formal training or certification. He was born in Guatemala, had attended school there through the sixth grade, and read and spoke English at a level commensurate with his education. He testified at trial that he had worked on "500, maybe a thousand batteries," had charged batteries at least 500 times, and had used jumper cables on batteries "more than 500 times," all without incident. He had learned how to handle batteries from his uncle in Guatemala and handled the Ford battery in the way he had always been shown, and in the same way as his co-workers. He understood that charging batteries generated explosive gas but believed the only way one could explode was if the vent caps were not securely in place and a nearby flame, a lighted cigarette, or a large number of sparks caused the accident. In this case he had checked to see that the vent caps were in place and secure before starting to loosen the cables. He noticed that the battery was warm to the touch and smelled of gas before the explosion, but these conditions did not concern him because he regarded them as normal for a battery being charged.

### B. Proceedings Below

Pineda and his wife brought suit in Superior Court naming East Penn, the Richardson Company,[3] and Leeth Brothers as defendants. Damages were sought for personal injury and loss of consortium on theories of negligence, strict liability, and inadequate warning. At the close of plaintiffs' case, the court directed verdicts in favor of Richardson on the failure to warn count and in Leeth Brothers' favor on the negligence count. As to the remaining claims, the jury entered findings by answers to interrogatories on a special verdict form.

---

**2.** His trial testimony was that he had never read the warning on that particular brand of battery, but had read and was familiar with those on "other brands, other names."

**3.** East Penn originally impleaded Richardson, and Pineda later named Richardson as a defendant.

It found East Penn negligent in the design or manufacture of the battery, and that its negligence was a proximate cause of Pineda's injury, but deadlocked on the question of Richardson's negligence. It found that Pineda had not assumed the risk of injury caused by the exploding battery. It found all defendants liable on the strict liability count, and that the defect proximately caused Pineda's injury, but deadlocked on whether the injury was caused by misuse of the battery not reasonably foreseeable to the defendants. Finally, it found that the warning label on the battery was inadequate, and that the inadequacy was a proximate cause of Pineda's injury.

The defendants filed various motions for judgment notwithstanding the verdict. Pineda moved for judgment on the strict liability count and, in the alternative, for a new trial on all issues as to which the jury had deadlocked. With respect to the verdict on negligence, the court noted that all of the evidence pointed to the possibility that the vent caps, which had been manufactured by Richardson, were defective in that they failed to stop a flame or spark from passing through the cap to the space within the battery above the electrolyte where hydrogen gas concentrated. In the absence of any other plausible theory of manufacturing negligence, and the jury's inability to reach a verdict with respect to Richardson, the court concluded that the verdict against East Penn on this count was so clearly inconsistent with the evidence as to reflect confusion or mistake. The court refused to grant East Penn's motion for j.n.o.v. on this point, but vacated the verdict and set the negligence claim for a new trial.

On the strict liability count, the court noted that much of the two-week trial had focused on whether the explosion was caused by the way the battery was charged, and whether this created risks reasonably unforeseeable to the defendants, or rather by some defect in the vent caps. Under these circumstances, the court reasoned that the jury's inability to resolve the question whether unforeseeable misuse by Pineda or someone else might have caused the injury "suggests its grave misgivings about the weight of the evidence." The court vacated the verdict on strict liability and remanded that count, as well as any defenses, for retrial.

■ The court refused to disturb the jury's verdict on the failure to warn counts, denying East Penn's and Leeth Brothers' motions for j.n.o.v. It rejected the argument that the defendants were not obliged to warn Pineda because he was already aware of the dangers associated with working around batteries. As to the adequacy of the warning, the court concluded that whether the warning was sufficiently specific to warn or remind a mechanic with Pineda's level of experience was an issue of fact for the jury, and one on which reasonable jurors could disagree on the evidence presented. The court granted plaintiffs' motion to enter judgment upon fewer than all the claims and parties, finding that even when evidence of other defects is lacking, a product can be rendered defective by the absence of an adequate warning. Because this claim was not linked to any of the other counts remanded for retrial, the court found no just reason to delay entry of judgment.[4]

Invoking Super.Ct.Civ.R. 54(b), the court also entered judgment in favor of Leeth

---

4. In cases involving multiple claims or multiple parties, Super.Ct.Civ.R. 54(b) (1989) permits the trial court to direct the entry of a final judgment as to one or more, but fewer than all, the claims or parties upon an express determination that there is no just reason for delay. Absent this determination, an order disposing of fewer than all the claims is unappealable, *see Jones v. American Express Co.,* 485 A.2d 607, 609 (D.C.1984) (dismissal of counterclaim unappealable when principal claim still pending); *Metropolitan Baptist Church v. Minkoff,* 462 A.2d 460 (D.C.

1983) (per curiam) (grant of summary judgment unappealable when two counterclaims pending). Since Judge King's Rule 54(b) ruling expressly directed entry of judgment, and included the requisite finding that there was no just reason for delay, the entry of judgment on the failure to warn claim was a final appealable order. The same is true for the related judgment on Leeth Brothers' cross-claim for indemnity arising from its liability on the failure to warn judgment in Pineda's favor.

Brothers on its cross-claim for indemnity, noting that in its larger, brighter label Leeth Brothers had used language provided by the manufacturer in its own label. He also concluded that, "in the context of the evidence in the case that Plaintiff read the label," the jury's finding that the warning label was inadequate could only relate to the content of the label, not the form, and that under these circumstances Leeth's replacement of the East Penn label, if anything, ameliorated the deficiency of East Penn's warning.

## II.

Appellants' primary challenge is to the trial court's denial of their motions for judgment notwithstanding the verdict on the failure to warn claim. In granting judgment *non obstante veredicto,* the trial court "render[s] the verdict mandated by law irrespective of the verdict issued by the jury." *District of Columbia v. Cassidy,* 465 A.2d 395, 397 (D.C.1983) (per curiam). The court's authority is limited, however, for it may resolve as a matter of law factual issues put to the jury only when "the facts, viewed most favorably to the non-moving party, permit but one reasonable conclusion as to the proper judgment." *Id., quoting District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982) (en banc). Our standard of review replicates the trial court's inquiry. *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982).

### A. Failure to Warn

#### (1) Theories of Liability and the Duty to Warn

▬ A product manufacturer's or seller's failure to warn the user of foreseeable risks associated with use of the product may give rise to a cause of action sounding in either negligence or strict liability. *Russell v. G.A.F. Corp.,* 422 A.2d 989, 991 (D.C.1980) (per curiam). Under a strict liability theory, recovery is predicated on findings that the product entered the stream of commerce with a design or manufacturing

defect rendering it unreasonably dangerous. The failure to warn branch of strict liability recognizes that some products, even if perfectly designed and manufactured, cannot be made completely safe for their intended use. RESTATEMENT (SECOND) OF TORTS, § 402A comment *j* (1965). In such cases, the defect and unreasonable danger "is the failure to attach adequate warnings to a product that, as designed and manufactured, may in certain circumstances cause injury." *Payne v. Soft–Sheen Products, supra,* 486 A.2d at 725. A failure to warn can also result in liability for negligence, as "the supplier of a product is liable to expected users for harm that results from foreseeable uses of the product if the supplier has reason to know that the product is dangerous and fails to exercise reasonable care to so inform the user." *Id.* at 721.

▬ The duty of the manufacturer or seller, however, is the same under both theories: essentially one of ordinary care. *Russell, supra,* 422 A.2d at 991. "The seller or manufacturer of a product whose use could result in foreseeable harm has a duty to give a warning which adequately advises the user of attendant risks and which provides *specific* directions for safe use." *Burch v. Amsterdam Corp.,* 366 A.2d 1079, 1086 (D.C.1976) (emphasis in original). The plaintiff may seek damages for a negligent failure to warn, or invoke strict liability arising from the same failure, or both. *Payne, supra,* 486 A.2d at 721 n. 9, *citing Russell, supra,* 422 A.2d at 991 n.\*.

▬ Here, the claim of failure to warn was put before the jury as an independent cause of action, and it is unclear which theory of liability underlies it. For purposes of appellants' principal argument that they either owed no duty to Pineda or, in any event, did not breach it, the distinction is immaterial. Almost the only significance of a finding of a breach under the different theories lies in the effect on availability of certain defenses.[5] Contributory

---

**5.** Indeed, Prosser and Keeton note that a strict liability action for failure to warn is "really

nothing more than a ground of negligence liability described as the sale of a product in a

negligence is not a defense to a strict liability claim, but assumption of the risk bars recovery under either theory. *See Payne, supra,* 486 A.2d at 721 n. 9, *quoting* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 MINN. L. REV. 791, 838–39 (1966). Here the jury found no assumption of risk by Pineda, and appellants do not dispute that finding.

### (2) Duty to Warn and the "Experienced User" Exception

■ Under either theory, the threshold question to be decided is whether the manufacturer or seller owed the user any duty to warn. *Payne, supra,* 486 A.2d at 721; *Russell, supra,* 422 A.2d at 992; *Hull v. Eaton,* 263 U.S.App.D.C. 311, 317, 825 F.2d 448, 454 (1987) (per curiam) (applying District of Columbia law). Generally, the existence of a risk of harm reasonably foreseeable to the product supplier gives rise to a duty to warn of the danger, and to advise of means of ameliorating it. In *Russell,* this court concluded that a duty to warn exists when the evidence shows that the defendant "knew or should have known of a danger sufficiently serious to require a warning." 422 A.2d at 992. *See also McNeal v. Hi-lo Powered Scaffolding,* 266 U.S.App.D.C. 473, 477, 836 F.2d 637, 641 (1988) (applying District of Columbia law); *Hull, supra,* 263 U.S.App.D.C. at 317–18, 825 F.2d at 454–55.

Appellants assert that they had no duty to warn Pineda of the hazards that attended handling their battery. Pineda counters by citing testimony from witnesses for the defendants that they were aware that: (1) charging and jump-starting of batteries by persons of varying levels of skill and experience is commonplace, and (2) these activities present extreme hazards. He argues

that the jury could properly find that the dangers associated with charging a battery are pronounced enough to warrant specific warnings as to the significance of the odor of gas, a battery warm to the touch, and the dangers associated with any action that might cause a spark under these conditions, and that these risks were reasonably foreseeable to the appellants. Appellants, while conceding that a duty to warn exists generally, base their first argument upon an "exception" to the general rule: because Pineda was an experienced and "sophisticated" user of batteries, and well-acquainted with the particular risks (*i.e.,* ignition of explosive gas) associated with them, they had no duty to warn him of these dangers. And since no duty existed as a matter of law, the court erred in denying their motion j.n.o.v.

■ In *Burch v. Amsterdam Corp., supra,* the progenitor of failure to warn decisions in this jurisdiction, we rejected the defendant's argument that the adequacy of a warning label could be resolved as a matter of law in circumstances where the plaintiff was not an experienced user of a highly volatile flooring adhesive. 366 A.2d at 1088 n. 25. We distinguished cases from other jurisdictions in which courts had held a label adequate as a matter of law based on two principles: contributory negligence as a matter of law by the plaintiff, *see Moschkau v. Sears, Roebuck & Co.,* 282 F.2d 878 (7th Cir.1960), and the rule that "there is no duty to warn against a danger which is already known to the plaintiff," *Burch, supra,* 366 A.2d at 1088 n. 25, *citing Borowicz v. Chicago Mastic Co.,* 367 F.2d 751, 758 (7th Cir.1966) ("no one needs notice of what he already knows").[6] The "experienced user" exception stems from

---

defective condition, subject, however, to the defenses and other limitations on liability applicable *to strict liability rather than negligence."* W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER & KEETON ON THE LAW OF TORTS, § 99, at 697 (5th ed.1984), *quoted in Payne, supra,* 486 A.2d at 721 n. 8.

**6.** Obviously, only the latter theory can sustain the "sophisticated user" exception to the duty to warn in the form urged upon us by appellants.

The comparative fault of the plaintiff is relevant, and perhaps dispositive, on the issue of causation, but not on whether a duty exists. On the question of causation, it is also important to appreciate that the theory of recovery—strict liability or negligence—makes a difference, because contributory negligence of the plaintiff, even if established as a matter of law, does not permit the judge to resolve the issue of strict liability for failure to warn as a matter of law. *See* page 1118, *supra.*

the view enunciated in the Restatement (Second) of Torts that the supplier of chattels has a duty to warn of inherently dangerous conditions

> if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition that a mere casual looking over will disclose, unless the circumstances ... are such that even so casual an inspection will not be made. However, *the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous.* In such case, if the supplier, having such special experience, knows that the condition involves danger and *has no reason to believe that those who will use it will have such special experience* as will enable them to perceive the danger, he is required to inform them of the risk....

RESTATEMENT (SECOND) OF TORTS, *supra*, § 338 comment *k* (emphasis added).

Thus the "experienced user" exception to the duty to warn is properly viewed as a form of the "knowledge of danger" rule. *See American Mutual Liability Ins. Co. v. Firestone Tire & Rubber Co.*, 799 F.2d 993, 994 (5th Cir.1986), *citing West v. Hydro–Test, Inc.*, 196 So.2d 598, 606 (La.Ct. App.1967) (exception applies when plaintiff, due to experience, knows or should have known of danger). In circumstances where the danger is less than obvious, the user of a product may rely on the supplier's superior knowledge of latent dangers, unless his own special experience enables him to perceive those hidden dangers himself. An experienced professional, employed for the very purpose of handling the dangerous instrumentality in question, is more likely than an ordinary consumer to have the requisite knowledge of the specific risks.[7] The test is whether the user, by virtue of his profession and experience, knew or should have known of the latent danger. *American Mutual Liability, supra*, 799 F.2d at 995; *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 687 (8th Cir. 1981).

### (3) Application of the Exception

#### a. Actual Knowledge

■■■ Because it focuses on actual or constructive knowledge—what the user knew or reasonably should have known— the applicability of the "experienced user" exception to the duty to warn is a question of fact for the jury when the extent of the plaintiff's knowledge is in dispute. *Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 244 (2d Cir.1980). Appellants have failed to point to evidence demonstrating that the question should have been resolved by the court as a matter of law. They argue that the evidence showed conclusively that Pineda, by his experience and training, had *actual knowledge* of the dangers associated with charging batteries,[8]

---

7. This concept has also been extended to charge professionals with constructive knowledge of risks for purposes of imposing tort liability on them. *See, e.g., Thibodaux v. McWane Cast Iron Pipe Co.*, 381 F.2d 491, 495 (5th Cir.1967) (consulting engineers chargeable with knowledge of corrosion characteristics of cast iron pipe which allowed gas to escape).

8. Appellants place considerable emphasis on Pineda's deposition testimony, used at trial on cross-examination to impeach him and read into the record, to bolster their argument that he was a "sophisticated user" familiar with the proper way to handle batteries and the risks associated with failure to handle them in the prescribed manner. Pineda either disavowed or clarified much of this testimony at trial. For example, Leeth Brothers asserts that he "admitted that he had used goggles in other work places while working with batteries in order to protect his eyes," and that "he had received instruction during his career as a mechanic before coming to Callaham's on safety precautions while working with batteries." Both admissions occurred in deposition. At trial Pineda testified that he had never worn goggles when working around a battery, had never been instructed to do so, and that most mechanics did not take this precaution either. He further testified that his only "instruction" in handling batteries was what he had received by observing others, including his uncle in Guatemala. He explained similar turnabouts in his testimony by stating that at deposition "[t]hey [the lawyers] no give me time to answer the question right. And my English is not too understand very well."

and similar knowledge of the safety precautions to be taken when working around them.[9] They assert that, from his testimony, Pineda recognized "the warning signs of a battery with the potential to explode."

Pineda, however, testified that he had received only informal instruction in the care and handling of batteries as a youth in Guatemala, *see* note 8, *supra,* that he handled the battery on the day of the accident exactly as he had seen his uncle do it and as he had done himself on hundreds of occasions, and that he did not foresee the explosion because he understood that a spark would not cause a battery to explode unless the vent caps were loose or removed. In fact, he had not worn goggles while removing the battery because he perceived no danger under the circumstances. Pineda viewed the "warning signs" of a potential explosion that appellants contend he recognized—the smell of gas and the warmth of the battery case—as normal incidents of charging. He was aware that a large quantity of sparks could cause a battery to explode, but believed that this would occur only if someone was connecting or disconnecting the battery in the wrong manner, whereas a small spark was normal in work on battery cables and would not cause problems.

All told, this testimony fails to prove as a matter of law that Pineda had nothing to learn from a properly detailed warning.

### b. Constructive Knowledge

Appellants also charge Pineda with constructive knowledge of the "right" way to handle a battery. Leeth Brothers argues that the testimony of Pat Goss, an expert witness for the defense, set forth the standard of care expected of an "experienced" mechanic regarding the handling of batteries after recharging. Goss testified that, upon smelling gas and noting that a battery is warm to the touch, a mechanic should walk away and let the battery cool down for an hour before touching it. Then, before attempting to disconnect the jumper cables, he should first cover the vent caps with a wet rag to dampen any spark ignited, then disconnect the negative cable before the positive. Goss stated that the negative jumper cable should never be connected to the negative terminal of the "dead" battery, as Pineda had done, but to a piece of grounded metal on the disabled vehicle. Pineda, as Leeth Brothers argues, "should have known that this battery would not have exploded if the negative cable had been removed 'by the book,' " as explained by Pat Goss, or if the negative jumper cable had been attached to a grounded piece of metal instead of the negative terminal.[10]

Appellants, however, ignore the testimony of plaintiffs' expert, Dr. Abraham, who stated that the way in which Pineda had disconnected the cables was correct given the way in which they had been connected. He also stated that, until the Battery Council recommended grounding the negative cable, the accepted way of charging batteries had been the manner which Pineda thought correct. Abraham's opinion was that, if there was indeed a "proper method" of connecting battery cables, it should appear on the warning label to instruct both the layman and experienced user alike.

Had the substance of the deposition testimony been undisputed at trial, appellants' argument that the court should have determined Pineda to be a sophisticated user as a matter of law would have greater force. But evidence of Pineda's awareness of the risks, including his inconsistent statements, left considerable doubt as to his actual degree of sophistication, and thus raised typical issues of fact and credibility for the jury to resolve.

9. Leeth Brothers claims that Pineda testified he had read manuals and books three or four times containing information on electrical systems of the engines he worked on, implying that this instruction included the proper handling of batteries. Pineda, however, denied that he had read anything about the proper way to replace a battery, or the dangers associated with handling them; he had learned to install and remove batteries from his uncle in Guatemala: "That is the way I still do it."

10. We observe that this testimony by Goss may be largely irrelevant, since Pineda testified that the explosion occurred after he had successfully removed both jumper cables, when he attempted to remove the cables connecting the battery in question to the others in the battery unit.

We conclude that, while Pineda clearly knew that a person should exercise care around batteries because they produce explosive gases, the evidence that he knew or reasonably should have known of the specific risk of explosion associated with charging and jump starting was not so one-sided as to justify a determination as a matter of law that appellants owed him no duty to warn.

### (4) Adequacy of the Warning

■■■ For similar reasons, we reject appellants' further contention that the trial court erred in allowing the jury to decide whether the warning label was adequate. Here too, the evidence was not so unbalanced as to admit of only one reasonable conclusion.

As noted previously, in *Burch* we held that the duty to warn embraces two obligations: to "advise[ ] the user of attendant risks," and to provide *"specific* directions for safe use." 366 A.2d at 1086 (emphasis in original). The degree of specificity required in identifying risks and providing instructions is measured by the potential magnitude of the harm, and the likelihood of its occurrence. *McNeal, supra,* 266 U.S. App.D.C. at 479, 836 F.2d at 643, *citing Russell, supra,* 422 A.2d at 992; *Burch, supra,* 366 A.2d at 1087 n. 24 (citations omitted). Given the fact-intensive nature of these variables, the issue is generally one for the jury. *McNeal, supra,* 266 U.S. App.D.C. at 479, 836 F.2d at 643. In addition, as the trial judge recognized, the plaintiff's level of experience is a relevant factor in determining whether the warning was adequate.

> The sufficiency of a particular warning, in light of the sophistication of its intended users, is ordinarily one of fact for the jury.... [I]n cases in which there is a potential for serious injury, the adequacy of even a relatively clear warning should not be determined as a matter of law, but is a question of fact for the jury.

*Payne, supra,* 486 A.2d at 723 (citations and internal quotation marks omitted).

Pointing out that the battery label warned Pineda that "batteries produce explosive gas," to "keep ... sparks away," and to "always shield eyes when working near batteries," and that Pineda was already aware of these risks through his experience, appellants argue that the only thing the label did not do was instruct him on how safely to practice his trade, something it was not required to do. Pineda counters that the warnings were inadequate because they failed to advise of certain risks, unforeseeable to someone with his level of experience and training, that might arise during charging or jump-starting a battery.

The label did disclose some risks inherent in the use of batteries, *viz.,* the generation of explosive gases and the risk of severe burns and eye injury from contact with sulfuric acid. The general warnings against bringing sparks, flame and cigarettes near a battery and in "working near" one without eye protection addressed these risks. Yet, despite the concession by appellants' own witnesses that users at all levels of experience routinely charge and jump-start batteries, and that these are hazardous practices, the label contained almost no warning of particular or heightened dangers associated with charging or jump-starting or instructions aimed at avoiding explosions and other harms during these foreseeable uses. There were no directions on proper jump-starting procedures,[11] and instructions on charging were confined to the pallid prescription, "ventilate when charging." Although the label advised that "batteries produce explosive gas," it did not point to dangers attending the abnormal generation of hydrogen gas that can occur during charging and jump-starting.

Given the extremely hazardous effects of an exploding battery, and the conceded fact that these risks are pronounced when a battery is being jump-started or charged, a jury could reasonably find that more specific instructions for proper charging and jump-starting were necessary to make the

---

**11.** As noted earlier, Dr. Abraham's opinion was that the uncertainty in this area dictated the

need for instructions on the proper connection of jumper cables.

product reasonably safe for use by a mechanic of Pineda's level of experience and expertise.[12]

We reiterate: this is not a case where the evidence shows one-sidedly that adequate instructions on safe charging and jump-starting practices would have been superfluous given the user's professional familiarity with safe handling standards. Pineda had no formal training, he had read no literature on charging and jump-starting, and he was unaware of the right way to jump a battery as described by appellants' witnesses or that the battery could explode if handled in the manner he employed. As noted earlier, there was even disagreement among the experts on the "right" way to handle a battery. Under these circumstances, we agree with the trial court that

it would have been improper to take the issue of adequacy of the warning from the jury. A reasonable juror could conclude that, in light of Pineda's experience and knowledge, the warning was deficient in "specific instructions for safe use" that would prevent, or reduce the risk of, the occurrence of harms associated with jump-starting or charging.[13]

### B. Causation

■ More substantial are appellants' arguments that any substantive deficiency in the warning label could not have been a proximate cause of Pineda's injury because he did not read the label or because, even if he had read it, he would have acted as he did regardless of the warning.[14] To reverse the denial of the judgment n.o.v. on proximate causation grounds, we must con-

12. These could, for example, include a warning to allow time for the battery to cool and gas to dissipate after charging, and directions not to charge the battery at a high rate for more than a few minutes. It is true that crowding additional information onto a warning label can have the undesired effect of diluting the warning's prominence, thus diminishing its effectiveness, *see Burch, supra,* 366 A.2d at 1089 (Reilly, C.J., dissenting), but it is not necessary that all such detailed information appear directly on the battery label itself. In *Cotton v. Buckeye Gas Products Co.,* 268 U.S.App.D.C. 228, 840 F.2d 935 (1988), the United States Court of Appeals for the District of Columbia Circuit, applying Virginia law, upheld the trial court's resolution of a failure to warn claim against the plaintiff based in part upon the fact that detailed instructions on the correct handling of propane cylinders were provided in a National Liquid Propane Gas Association pamphlet which the supplier had delivered to the plaintiff's employer, who in turn posted it on the bulletin board of the construction site where the cylinders were used. *Id.* at 229, 231, 233, 840 F.2d at 936, 938, 940.

In this case, there was testimony that the Battery Council International—the organization that had composed the text of the warning on the battery—published a Battery Service Manual on the proper procedures for charging batteries. A vice president for East Penn testified that he had "no knowledge" of whether East Penn provided the manual to Callaham's, but that "it was made available" to Leeth Brothers. Despite testimony from several expert witnesses that workshops in which batteries were serviced could be expected to have the BCI manual on hand, Willie Callaham, Pineda's supervisor, testified that, to his knowledge, there was no battery service manual available in his shop. Beyond testimony that East Penn made the manual "available" to distributors of its product, the record is de-

void of evidence that the manual was actually delivered to Leeth with the expectation that the retailer would communicate critical information in it to its customers, or of any steps taken by East Penn to ensure that safety information therein reached the ultimate consumer. In any event, East Penn does not argue that the "availability" of the manual to Leeth Brothers bears on the issue of the adequacy of the warning vis-a-vis Pineda, or on any other issue in the case. *Cf., Russell, supra,* 422 A.2d at 992–94 (discussing adequacy of warning given to an intermediary).

13. It is true that the label mentioned wearing eye protection, and that Pineda's most serious injury was partial blindness. However, in light of trial testimony that mechanics often do not wear goggles, the jury could reasonably find that the defendants should have anticipated this fact and supplied a more specific warning detailing dangers associated with charging and jump-starting that would have *prevented explosions,* in addition to suggesting means of reducing injuries once an explosion occurred. *See Payne, supra,* 486 A.2d at 723, *quoting Ferebee v. Chevron Chemical Co.,* 552 F.Supp. 1293, 1304 (D.D.C.1982), *aff'd,* 237 U.S.App.D.C. 164, 736 F.2d 1529, *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) ("One element of an adequate warning is a description of the precautions necessary to *avoid* the injury" [emphasis added; internal quotation marks omitted] ).

14. Despite the assertion in Pineda's brief that he had read the warnings on identical batteries Callaham's purchased from Leeth Brothers, Pineda testified at trial that he had not read the label on the battery that exploded, nor on batteries of that particular brand, but rather labels on "other brands, other names."

clude that there was no evidence affording a reasonable basis for the belief that appellants' failure to provide adequate warnings was a *substantial factor* in bringing about the harm at issue. *McNeal, supra,* 266 U.S.App.D.C. at 480, 836 F.2d at 644, *citing District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984); *Lacy v. District of Columbia,* 424 A.2d 317, 318 (D.C.1980) (emphasis in original).

■ In the failure to warn context, it is first necessary to distinguish between (1) failure to take adequate steps to ensure the warning was communicated to the ultimate user—issues involving the prominence and location of the label—and (2) failure to provide a warning that, if communicated to the user, would have been adequate to warn of risks—which involves the content of the warning. When the failure to warn is based upon the steps taken to communicate the warning, the fact that the plaintiff never read the warning is itself evidence that the label was inadequate, and should not bar recovery. *See Rhodes v. Interstate Battery System of Am.,* 722 F.2d 1517, 1519 (11th Cir.1984). But when the cause of action is predicated on the content of the warning, as in this case, the plaintiff's own failure to read it will be contributory negligence in some jurisdictions. *Id.*

In this jurisdiction, however, Pineda's admission that he did not read the label is not itself fatal, even though his claim relates to the content of the warning. In *Payne,* without specifying which type of failure to warn we meant to reach, we adopted a "rebuttable presumption that the user would have read an adequate warning, and in the absence of evidence rebutting the presumption, a jury may find that the defendant's product was the producing cause of the plaintiff's injury." 486 A.2d at 725. We concluded that "a rule requiring a plaintiff to prove not only that the failure of a product to warn of a danger in a product made that danger unreasonable and that his injury grew out of the risk

caused by that danger, but also that the failure to warn caused his injury, would impose an impossible burden on the plaintiff, and would often preclude recovery because of pure speculation on the part of the jury." *Id.*

Our decision relied on *Ferebee v. Chevron Chemical Co., supra* note 13, in which the United States District Court for the District of Columbia, applying Maryland law, had ruled that the fact that a worker injured by dermal exposure to the herbicide paraquat had not read the label should not bar recovery.[15] The district court emphasized that the plaintiff was an employee who had not purchased the chemical for his own use, and that his principal source of information concerning paraquat was the oral instructions of his supervisors and co-workers. 552 F.Supp. at 1303. Recognizing that "learning by doing and learning by oral instruction are tried and true methods of educating manual workers in their jobs," the court ruled that it was not necessary for the plaintiff to prove that he would have read an adequate label personally, but only that *someone* in the workplace would have read it. *Id.* The court of appeals agreed that the jury could reasonably infer that, had the label warned of the danger in greater detail, the warning would have been communicated to and heeded by the worker. 237 U.S.App.D.C. at 173, 736 F.2d at 1538.

> Because there is no dispute that one or more employees at BARC did read the label, we hold that the jury could properly have inferred that, had a warning about the danger of disease from dermal exposure been included on the label, that warning would have been communicated to Mr. Ferebee and that he would as a result have acted differently. Alternatively, the jury could have inferred that an adequate warning would have led Ferebee's *employers* to undertake steps that would have protected him from paraquat poisoning—for example, provision of showers for use after spraying.

15. In *Payne,* this court cited with approval the decision of the United States Court of Appeals for the District of Columbia Circuit upholding the district court's denial of defendant's motion j.n.o.v. on this point. The district court analysis, *see* 552 F.Supp. 1293, and that of the court of appeals were almost identical.

*Id.* at 174, 736 F.2d at 1539 (emphasis in original). Under this analysis, implicitly approved in *Payne*, causation is inferred from the inadequacy of the warning itself.[16]

■ The inquiry, however, does not end there because evidence that a warning, even if communicated, would not have affected the conduct of the user rebuts the presumption of causation and, indeed, may be sufficient to break the chain of proximate causation entirely.[17] Accordingly, if the evidence shows that Pineda would not have heeded warnings communicated on an adequate warning label, he cannot rely on the *Payne* presumption, and may not recover absent proof that the inadequacy of the warning label was at least a substantial factor contributing to his injury. In arguing that "the alleged inadequacy of the warning had no effect on the way [Pineda] acted," appellants rely on his testimony that he had learned how to handle batteries from his uncle and by observing his coworkers, and had successfully handled them in the same way for many years. Considering also his testimony that he knew batteries produced explosive gas that could be ignited by sparks and that goggles should be worn when working around them, appellants argue that he would have disregarded adequate instructions on the safe handling of batteries even had they been conveyed to him.

We conclude that the testimony was insufficient to deprive Pineda of the presumption. Like the plaintiff in *Ferebee*, Pineda lacked formal vocational training in the use of the product in question, and testified that a principal source of his information about the proper handling of batteries was observing his coworkers. *Cf. Ferebee, supra* note 13, 552 F.Supp. at 1303. The same realities concerning communication of occupational risks in the modern workplace recognized by both courts in *Ferebee* apply here. Had the warning label contained specific warnings and instructions on charging and jump-starting, the jury could reasonably infer that someone at Callaham's,[18] perhaps even Pineda—who testified he had read labels on other batteries in the past—would have read them and taken steps to ensure that recommended safety procedures were observed in carrying out this hazardous procedure.

Accordingly, we will not disturb the jury's finding that the failure to warn proximately caused Pineda's injury.

### III.

### *Leeth Brothers' Cross–Claim for Indemnity*

East Penn argues that the trial court's entry of judgment in favor of Leeth Brothers on its cross-claim for indemnity was unsupported by either the facts or the law. It contends that Leeth Brothers assumed

---

16. The circuit court in *McNeal, supra,* citing *Payne's* rebuttable presumption, concluded that a reasonable jury could have found "that McNeal proved that Crosby failed to warn of the danger posed by misapplication [of retaining clips used on window washing scaffolding cables], and 'that his injury grew out of the risk caused by the danger,' " 266 U.S.App.D.C. at 481, 836 F.2d at 645, *citing Payne, supra,* 486 A.2d at 725, and noted that "Crosby has not advanced any evidence that suggests that McNeal would not have heeded an adequate warning." *Id.* at 481 n. 19, 836 F.2d at 645 n. 19.

17. In *Mampe v. Ayerst Laboratories,* 548 A.2d 798 (D.C.1988), as part of a patient's treatment for alcohol abuse, a psychiatrist prescribed a drug which caused violent physical reactions in persons who drank alcohol. The patient sued the drug manufacturer for failure to warn of the severity of the adverse reactions. The court

noted, however, that in drug warning cases it is the warning to the prescribing physician that is relevant, and held that the *Payne* presumption did not apply because "the chain of causation was broken by [the manufacturer's] unrebutted showing that, *regardless of what Dr. Wylie may have read or not read, the alleged inadequacy of the warning label had no effect on his decision to prescribe Antabuse for Mrs. Mampe.*" *Id.* at 802 (emphasis added).

18. In his deposition testimony read into the record at trial, Willie Callaham testified that he recalled there were "some danger signs" on the batteries purchased from Leeth Brothers, but that "I don't remember just what it says." East Penn's vice president had no knowledge of whether East Penn had provided the BCI battery service manual to Callaham's, and Callaham testified that the manual was not available in his shop.

the duty to label the batteries, and so assumed all liability associated with defective warnings. It asserts that the fact that the label affixed by Leeth Brothers contained exactly the same warning as that provided the seller by East Penn is irrelevant, because Leeth Brothers was at least equally negligent in its conduct since it was an experienced seller of batteries and held the product out to the public as its own. Leeth Brothers counters that relabelling—in a larger format—only improved the visibility of the warning, and that it reprinted the contents of the warning exactly. East Penn, therefore, as the author of an inadequate warning, should remain primarily responsible and not be allowed to pass through its liability to the seller.

### A. Express Contractual Duty to Indemnify

■ "One of the most common, and simple bases of indemnity is a contract that provides for it." W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, *supra* note 5, § 51, at 341. East Penn relies on a contract between it and Leeth Brothers requiring the latter to apply "cautionary and identification" labels to "unlabeled" batteries delivered to it by East Penn as encompassing a duty to indemnify East Penn in the event the manufacturer was held liable for a defective warning.[19] The trial judge found that this agreement did not apply to the battery in question, which was supplied to Leeth Brothers *with* a warning label. Although East Penn concedes that the agreement refers only to "unlabeled batteries," it nonetheless appears to argue that Leeth Brothers "had the right and assumed the duty" to label the battery in question. We find no reason to disturb the judge's finding as to the scope of this agreement. To discharge its duty to warn ultimate users, East Penn undertook to supply a warning label on the battery that injured Pineda,

and it cannot rely on a contract that did not apply to the battery in question to shift the entire loss to the seller.

### B. Implied Duty to Indemnify

■ Absent an express agreement, a duty to indemnify may also be implied, "out of a relationship between the parties," to prevent a result "which is regarded as unjust or unsatisfactory." *Myco, Inc. v. Super Concrete*, 565 A.2d 293, 297 (D.C. 1989). Does the manufacturer of a defective product stand in a relationship to the seller giving rise to an implied duty to indemnify the seller in circumstances where (a) the latter relies reasonably on the manufacturer's knowledge and skill in making the product free of defects, and (b) any negligence on the seller's part consists of at most a failure to discover a defect in the product? We think the answer is yes, and on this ground sustain the order of indemnity in this case.

■ When a product cannot be made entirely safe for reasonably foreseeable uses, and thus requires warnings and instructions, it is the manufacturer's duty to warn the ultimate consumer of the risks of harm, and a breach of that duty renders the product defective and unreasonably dangerous. *Payne, supra*, 486 A.2d at 725. Generally, the manufacturer's duty to provide a non-defective product may not be delegated to another distributor farther down the stream of commerce, because the duty runs to the ultimate user not the immediate purchaser. *Lonon v. Pep Boys*, 371 Pa.Super. 291, 538 A.2d 22, 27 (1988); RESTATEMENT (SECOND) OF TORTS, *supra*, § 402A comment *l* (not necessary that ultimate user or consumer have acquired the product directly from the seller). Although privity between the manufacturer and ultimate consumer is not required for the consumer to hold the manufacturer liable, *see Cottom v. McGuire Funeral Service*, 262 A.2d 807, 809–10 (D.C.1970), an intermedi-

---

**19.** This form contract, in its entirety, reads:

AGREEMENT

LABELING AGREEMENT between EAST PENN MANUFACTURING COMPANY, INC., Lyon Station, Pa. and Leeth Brothers, dated Dec. 14, 1976.

I, the undersigned, agree to assume labeling responsibility for unlabeled batteries delivered

to me by East Penn Manufacturing Company, Inc.

Labeling responsibilities include both cautionary and identification statements [rest of line redacted]. In addition, effective December 31, 1976, we will not attach warranty labels to unlabeled batteries. It is my responsibility to comply [rest of line redacted].

ary seller in privity with the manufacturer receives an implied warranty that the product is safe for its intended use. *See Williams v. Steuart Motor Company,* 161 U.S.App.D.C. 155, 165, 494 F.2d 1074, 1084 (1974). When a breach of that warranty exposes the retailer to liability in circumstances where its fault lay only in failing to discover and correct a defect created by the manufacturer, upon whose skill and expertise it reasonably relied, we think it equitable to shift the burden of loss entirely to the manufacturer. *Id.* at 164–65, 494 F.2d at 1083–84, *citing Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.,* 350 U.S. 124, 134, 76 S.Ct. 232, 237, 100 L.Ed. 133 (1956). *See also* Leflar, *Contribution and Indemnity Between Tortfeasors,* 81 U.PA. L.REV. 130, 156–58 (1932).

As the Restatement notes, "the basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay ... The unexpressed premise is that indemnity should be granted in any factual situation in which, as between the parties, it is just and fair that the indemnitor should bear the total responsibility, rather than to ... divide it proportionally between the parties by contribution." RESTATEMENT (SECOND) OF TORTS, *supra,* § 886B comment *c.* The Restatement identifies as one such factual situation:

> [where] the indemnitor supplied a defective chattel ... as a result of which both were liable to a third person and the indemnitee innocently or negligently failed to discover the defect.

*Id.* § 886B(d) & comment *h.*[20]

As the trial court found, the defect in the label supplied by East Penn concerned its content, not its form. Leeth Brothers' acts involved changing the form of the label—enlarging it—but not the substance of the

---

**20.** Courts have recognized an implied duty to indemnify on two principal theories. In "implied in fact" or "implied contract" indemnity, the nature of the relationship between the parties gives rise to an implied contractual duty to indemnify. *See Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp., supra,* 350 U.S. at 133–34, 76 S.Ct. at 237; *People's Democratic Republic of Yemen v. Goodpasture, Inc.,* 782 F.2d 346, 351 (2d Cir.1986). In "implied in law," *id.,* or "equitable" indemnity, the obligation is based on variations in the relative degrees of fault of joint tortfeasors, and the assumption that when the parties are not *in pari delicto,* the traditional view that no wrongdoer may recover from another may compel inequitable and harsh results. *See* RESTATEMENT (SECOND) OF TORTS, *supra,* § 886B comment *a;* 3 F. HARPER & F. JAMES, THE LAW OF TORTS, § 10.2, at 58 n. 51 (1986); Leflar, *supra,* at 154–56.

Early cases from this jurisdiction employing an "active/passive" or "primary/secondary" negligence dichotomy reflect this latter concept. Under this doctrine, while both joint tortfeasors are liable to the plaintiff, where one tortfeasor's negligence is "secondary or passive," the passive tortfeasor is entitled to indemnification from the active tortfeasor. *Nordstrom v. District of Columbia,* 213 F.Supp. 315, 318 (D.D.C.), *rev'd on other grounds,* 117 U.S.App.D.C. 165, 327 F.2d 863 (1963). *See also Coates v. Potomac Elec. Power Co.,* 96 F.Supp. 1019, 1021 (D.D.C. 1951). *Williams v. Steuart Motor Co., supra,* the case upon which both parties rely here, echoes both "implied contract" and "primary/secondary" negligence theories, citing both *Ryan Stevedoring* and a seminal Supreme Court decision

reflecting the *in pari delicto* rationale. *Id.* at 164–65, 494 F.2d at 1083–84, *citing Washington Gas Co. v. District of Columbia,* 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712 (1896). *See also id.* at 163–64 n. 10, 494 F.2d at 1082 n. 10 (citing District of Columbia "active/passive" cases noted above).

Because the terms "active" and "passive" and "primary" and "secondary" are indefinite, their utility as meaningful guideposts to when indemnity should be awarded has been criticized by the courts, *see, e.g., American Motorcycle Ass'n v. Superior Court,* 20 Cal.3d 578, 594, 146 Cal. Rptr. 182, 192, 578 P.2d 899, 909 (1978), and commentators. *See* 3 F. HARPER & F. JAMES, *supra,* § 10.2 n. 51, at 59 n. 51 ("fatuous pseudo-formulas"); RESTATEMENT (SECOND) OF TORTS, *supra,* § 886B comment *c* (such expressions descriptive but too narrow and misleading in some applications); Leflar, *supra,* at 155 (active/passive concepts "lay down no definite standards"). This court in *Myco, Inc. v. Super Concrete, supra,* acknowledged this critique in its discussion of the "active/passive" rule, which it declined to follow in favor of a theory of indemnity requiring some "independent duty" between indemnitor and indemnitee. 565 A.2d at 298–99. Yet similar criticism has been levelled against the "independent duty" formulation—a variation of the "implied contract" theory of indemnity.

> It is sometimes said that a right to indemnity arises when the indemnitor ow[e]s an independent duty to the indemnitee. This may prove to be nothing more than a way of stating the problem (when is a duty owed?).

RESTATEMENT (SECOND) OF TORTS, *supra,* § 886B comment *c.* While such notions as "active/pas-

warning. Its negligence, therefore, lay not in relabelling the battery but in failing to recognize and correct the substantive defects of the warnings and instructions on charging and jump-starting. In *Williams, supra,* the court held that an automobile retailer's failure to discover and remedy a latent manufacturing defect did not relieve the manufacturer of its primary duty of care in design and manufacture of the accelerator assembly, and that the retailer's breach of warranty to the user was but a consequence of the manufacturer's breach to it. 161 U.S.App.D.C. at 165, 494 F.2d at 1084. Here, although Leeth Brothers changed the label to include its trade name and warranty, and to make it more eye-catching, it did not change the wording of the warning but instead relied on East Penn's superior knowledge in formulating the contents of a battery warning. Leeth Brothers was indeed an experienced battery retailer,[21] but there was evidence fairly permitting the court to conclude that East Penn was much better situated than the retailer to identify and warn against risks connected with battery charging and jump-starting. Relying upon the principles articulated in *Williams* and the Restatement, we uphold the judgment for indemnity.[22]

## IV.

For the foregoing reasons, the judgments of the Superior Court are

*Affirmed.*

sive" negligence, "independent duties" and "special relationships" may be useful to identify situations where the court should "imply" an obligation to indemnify, to elevate such concepts to rules of general application may simply obfuscate what ultimately is a principle of equity:

> Indemnity is the shifting of responsibility from the shoulders of one person to another; and the duty to indemnify has been recognized in cases where the equities have supported it. A court's view of the equities may have been based on the relation of the parties to one another, and the consequent duty owed; or it may be because of a significant

difference in the kind or quality of their conduct.

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *supra* note 5, § 51, at 344.

21. Leeth Brothers' President, George Fisher, testified that the company had sold all types of batteries since 1913.

22. We express no opinion whether a different result would obtain if the retailer's reliance on the manufacturer was not reasonable under the circumstances, or if the retailer's negligence went beyond a mere failure to discover the defect. *See, e.g.,* Restatement (Second) of Torts, *supra,* § 886B comment *h.*